2009 OK CR 23

**James Eric PARKER, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. F–2008–216.**

Court of Criminal Appeals of Oklahoma.

Sept. 2, 2009.

John David Echols, L. Wayne Woodyard, Oklahoma Indigent Defense, Sapulpa, OK, attorneys for defendant at trial.

Craig Ladd, Carter County District Attorney, Ardmore, OK, attorney for the State at trial.

Michael D. Morehead, Appellate Defense Counsel, Norman, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Stephanie D. Jackson, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## OPINION

CHAPEL, Judge.

¶1 James Eric Parker, Appellant, was tried by jury and convicted of First–Degree Murder, under 21 O.S.Supp.2004, § 701.7 (Count I); Kidnapping, under 21 O.S.Supp. 2004, § 741 (Count II); and First–Degree Burglary, under 21 O.S.2001, § 1431 (Count III), in the District Court of Carter County, Case No. CF–2006–353.[1] In accord with the jury's recommendation, the Honorable Lee Card sentenced Parker to imprisonment for Life Without the Possibility of Parole on Count I, imprisonment for ten (10) years on Count II, and imprisonment for twenty (20) years on Count III, to be served consecutively.[2] Parker is properly before the Court to appeal his convictions and sentences.

1. The State filed a Bill of Particulars regarding the first-degree murder count, seeking the death penalty and alleging the following aggravators: (1) that Parker "knowingly created a great risk of death to more than one person"; and (2) "the existence of a probability" that Parker "would commit criminal acts of violence that would constitute a continuing threat to society." See 21 O.S.2001, § 701.12(2) and (7), respectively. In the second stage of this capital trial, Parker's jury found that the "great risk of death" aggravator applied, but rejected the "continuing threat" aggravator and did not sentence Parker to death.

2. This Court notes that Parker's Count I first-degree murder conviction and his Count III first-degree burglary conviction fall under the "85% Rule," for the serving of his sentences, but that his Count II kidnapping conviction does not. See 21 O.S.2001, § 12.1; 21 O.S.Supp.2002, § 13.1.

3. Prior to the trial in this case, Kim Parker divorced James Eric Parker and changed back to

¶2 Just before midnight on the evening of June 28, 2006, James Eric Parker stood on the back patio of the Dickson, Oklahoma, home of Danny Watterson, looking in through the open vertical blinds on Watterson's glass patio door. Inside, Parker could see Watterson sitting in his easy chair, with his back to Parker, watching television with Parker's wife, Kim (Gilbert) Parker, who was sitting on a nearby couch.[3] Right around midnight Gilbert heard a loud "popping noise" and the sound of shattering glass in the kitchen, just behind where she and Watterson were watching a movie in the living room.[4] Gilbert looked back and saw her husband standing on the patio holding a gun. When Gilbert looked over at Watterson, he was slumped in his chair, not moving.[5] Gilbert then heard more breaking glass and looked back to see her husband coming into the home through the shattered patio door.

¶3 Parker told Gilbert, "Grab your things, grab your purse. Get over here now or I'll shoot." Gilbert did as she was told.[6] Parker grabbed Gilbert by the hair and by the arm and began to lead her out the back door. Suddenly Parker stopped, announced that he was going to shoot Watterson again, and walked back to where Watterson was slouched lifeless in his chair. Gilbert heard the firing of another shot as she turned away.[7] Parker then led Gilbert out to his truck, which was parked outside.

her maiden name, Kim Gilbert. She will be referred to as "Gilbert" herein.

4. Gilbert testified on cross examination that at some point before the shooting, Watterson had come over to the couch and briefly kissed her and rubbed the back of her hair, before returning to his chair, which was separated from the couch where she was seated by a small end table.

5. The evidence presented at trial suggests that Watterson was hit in the back of the head by one of the first shots fired by Parker and that he immediately lost consciousness.

6. Gilbert testified that her husband seemed "enraged" and "out of control" and that she did as she was told, because she was very scared.

7. The medical examiner testified that Watterson died from multiple gunshot wounds. She noted that Watterson had two gunshot wounds to the

¶ 4 The tumultuous relationship between Gilbert and Parker began long before that fateful June night. Gilbert testified that they began dating when she was 14 years old, in 1983 or 1984.[8] Though they had been a "couple" ever since, they did not actually marry until 2005. They had two children together: a son and a daughter, who were 19 and 17 years old, respectively, at the time of the shootings. Gilbert testified that she and Parker did not actually live together until the year after their daughter was born, but that they lived together almost continuously after that. Gilbert testified that Parker was an alcoholic and was verbally and physically abusive when they were first living together, but that he went through "rehab" while their second child was still a baby and stopped drinking entirely after that.[9]

¶ 5 Gilbert testified that she and Parker finally got married on June 2, 2005. She acknowledged that by the time they actually got married, however, their relationship was very bad, and she was involved in an affair with Danny Watterson, which began in April or May of that year.[10] Gilbert met Watter-

son at the Michelin tire plant in Ardmore, Oklahoma, where Gilbert, Parker, and Watterson all worked. Gilbert testified that Parker became suspicious that she was having an illicit relationship with Watterson in the fall of 2005, based on her cell phone records showing numerous calls to his number, and that Parker initially confronted her about it with a knife.[11] Gilbert always denied the affair, however, and claimed that she was calling Watterson for other reasons.[12] Gilbert and other witnesses testified that, after not drinking for over fifteen years, Parker started drinking again that fall, after he became suspicious that Gilbert was having an affair.[13]

¶ 6 Gilbert testified that Parker purchased a gun, either a rifle or a shotgun, around Thanksgiving of 2005 and that he later obtained two hand guns—even though he had never previously owned a gun and Gilbert did not want them in their home.[14] A Michelin supervisor testified that in late 2005, Parker asked him to point out Watterson, whom Parker did not know.[15] Gilbert testified that

head, one that entered on the right side of the back of his head and one that entered on his far left temple, either of which alone would have caused immediate loss of consciousness and death shortly thereafter. The medical examiner also described a third gunshot wound, where entry was on the back of the left shoulder, with a possible fourth "grazed" gunshot wound on the right middle part of Watterson's back.

8. Parker was born in July of 1966 and would have been around 17 years old at the time.

9. Gilbert testified that even after he quit drinking, Parker was still sometimes verbally and emotionally abusive to her, but that he was no longer physically abusive.

10. Gilbert testified that she agreed to marry Parker "out of obligation" to him and the kids and that the kids were excited about the planned Las Vegas wedding. Parker later became fixated on the fact that Gilbert placed a call to Watterson during the time the Parker family was in Las Vegas for the wedding. Within Parker's journal, which was admitted at trial, he declared that he was going to commit suicide on June 1, 2006, the one-year anniversary of Gilbert's call to Watterson from Las Vegas, and began counting down to that day. Yet he also declared in his journal that he had "evil thoughts running through [his] head," that he was afraid he was going to "get so angry and [lose] it," that he was "not concerned with killing another individual though there are

several potential victims," and finally, "Death means nothing to me, I'm not the least bit worried about it."

11. Gilbert testified that the phone calls to Watterson began in February or March of 2005, though the actual affair began a few months later.

12. In particular, Gilbert acknowledged that she told her husband that Watterson was supplying her with the prescription drug Xanax, which was not true.

13. Parker sought employer-provided counseling in late 2005 for his marital problems. His counselor testified at trial that Parker suspected his wife was having an affair, that he "loved her desperately," and that "he desperately wanted this relationship and his family to remain intact."

14. Evidence at trial established that a Ruger P89 semi-automatic 9 mm pistol, which was recovered from Parker's truck, and which Gilbert identified as Parker's, matched all the casings found at the crime scene and all the bullets found at the scene and in the body of Watterson.

15. The supervisor declined to point out Watterson, but did report Parker's request, and Parker was warned at the time not to cause any trouble at work.

she left Parker and their home several times during the year after their wedding, but that he would always track her down and get her to come back, sometimes threatening suicide if she did not return.[16] Gilbert testified that on June 25, 2006, she left Parker for the final time and moved into an apartment that she had rented in a gated community.[17] Watterson picked Gilbert up at her new apartment on the night of Wednesday, June 28, 2006, and they planned to spend the evening watching movies together at Watterson's home.

¶ 7 William Watterson, the 16–year–old son of Danny Watterson, was in his bedroom watching a movie on the night his father was shot. He testified that around midnight he heard two "popping sounds," followed a short time later by a third popping sound. William testified that he came out of his bedroom and stood in the doorway looking into the living room, where he saw a man, whom he identified at trial as Parker, standing about three feet from where his father was slumped in his chair, and Gilbert standing nearby. William heard Parker say to Gilbert, "Let's go." William testified that Parker and Gilbert did not see him and that he returned to his room, locked his door, went into his closet, and called "911." William waited about five minutes before jumping out his bedroom window to get out of the house and go meet the ambulance.

¶ 8 Parker held his wife captive in his truck for nearly 40 hours, forcing her to stay with him and sometimes to drive as they went first toward Oklahoma City, then south toward Texas and just over the border, then back into Oklahoma. Gilbert testified that during this time Parker was very angry and would hold the gun to her face and head, sometimes hitting her on the head with it,

and that he also punched her in the face. Gilbert testified that at one point, when Parker was pressing the gun against her head as she was driving, she attempted to push it away. The gun went off a few inches from her face, resulting in a bullet hole in the driver's side door, a shattered driver's window, and burn marks on her arm.[18] During this time Parker told Gilbert that he "hadn't decided whether he was going to kill her or just beat the shit out of her."

¶ 9 During this time Parker also contacted their children and attempted to arrange to meet them, but they were too scared to go. Parker spoke to his son directly by cell phone and told him that he had shot and killed the man that his mom had been with. Parker was in phone contact with other family members as well; and by late afternoon of June 30, 2006, he agreed to turn himself in to F.B.I. Agent Alan Carpenter, who lived next door to and was friends with Parker's brother. Carpenter encouraged Parker to surrender himself in western Oklahoma, where cell phone tracking indicated he was at the time, but Parker insisted that he wanted to turn himself in directly to Carpenter, in Ardmore. Instead, around 5:30 p.m. that day, between Fort Cobb and Anadarko, Oklahoma, highway patrol officers forced Parker's truck off the road, after he refused to pull over, and arrested him without further incident.

¶ 10 At Parker's trial his counsel admitted at the outset, during voir dire, and throughout the proceedings, that Parker had shot and killed Danny Watterson. Parker's defense was to maintain that the killing of Watterson did not constitute first-degree murder, because he was both intoxicated and overcome with emotion at the time, due to the fact that he had finally witnessed and confirmed his wife's infidelity.[19] During the

16. Gilbert testified that Parker would get out his guns and threaten to kill himself. She testified that he never actually threatened to shoot her, but that he once wrote her name on a bullet.

17. Gilbert testified that she paid extra for a garage at her new apartment, hoping that it would make it more difficult for Parker to find her. Gilbert also arranged for an attorney to file divorce papers and seek a restraining order against Parker, after she was safely in her new home. The divorce petition was filed on June 27, 2006.

18. State's Exhibit 5 at trial included pictures of Gilbert taken after Parker was arrested, with two black eyes, marks on her left arm, and blood on her shirt.

19. At the conclusion of the first stage of Parker's trial, the trial court instructed his jury on the elements of first-degree "heat of passion" manslaughter. The trial court declined to instruct on Parker's "intoxication defense," however, finding that the evidence presented at trial was insufficient to suggest that, at the time of the shootings,

trial the State presented recordings of a telephone conversation between Gilbert and Parker, who was in jail at the time, which occurred in July of 2006, approximately two weeks after the crimes at issue.[20]

¶ 11 The recordings include an opening announcement to the parties that the call is being recorded. Nevertheless, during their conversation Parker repeatedly tells Gilbert that he has absolutely no remorse about shooting Watterson: "I don't have a fucking remorse in my body about it." And he tells Gilbert, "I'm thinking I should have killed you too." [21] During the same phone conversation, Parker also blames Gilbert for what happened, berates her for going to the funeral home to see Watterson's family and for not writing him, asks if she still loves him (and then accuses her of lying when she assents), and pleads with Gilbert to promise that she will come visit him in jail.

¶ 12 Parker raises three propositions of error on appeal.

■ ¶ 13 In Proposition I, Parker asserts that the trial court abused its discretion and committed reversible error when it limited the parties to "a mere five minutes" to voir dire the individual prospective jurors in this case. Parker also complains, rather paradoxically, that "[t]he trial court chose, for this capital trial, the most time-consuming method of jury selection imaginable." The five-minute time limit that the trial court imposed on the parties, starting on the second day of voir dire, was repeatedly challenged by defense counsel.[22] Hence this claim was adequately preserved. Nevertheless, the time limit must be understood and evaluated within the entire context in which it arose and was enforced.

¶ 14 As the trial court announced at the outset, the jury selection process in this case was conducted as follows. On the first day, all 85 prospective jurors were sworn in and given questionnaires to fill out, which had to be returned before they could leave for the day, and 30 of them were told to come back the next morning.[23] The next morning, after more explanatory instructions from the court about the process, the court began bringing in individual prospective jurors, one at a time, for individual voir dire in the judge's chambers—first by the trial court and then by each of the parties. The plan was that as individual jurors were dismissed or struck for cause from this original group, other prospective jurors would be contacted and brought in, until they had a total of 30 jurors who had survived for-cause challenges or been accepted by the parties. At this point each party would then be required to exercise its 9 peremptory challenges, alternating one-by-one between the parties, until they were left with the 12 jurors who would decide Parker's case. Parker neglects to mention in his brief that this process was almost exactly what his attorneys sought prior to his trial.[24]

---

Parker was intoxicated to the point that he could not form the intent of "malice aforethought."

**20.** The recordings are of two separate phone calls, but it is clear from the context that the second call was simply a continuation of the original conversation, after the first call was cut off.

**21.** Parker later adds, "I wish to God I would've killed you. I swear I do."

**22.** Parker's counsel also repeatedly sought a mistrial based on this voir dire time limitation.

**23.** The other 55 prospective jurors were instructed to simply call the court the next morning. Before dismissing everyone to complete their questionnaires, the trial court instructed all the potential jurors regarding the following: the charges at issue, the name(s) of the defendant, the victims, and potential witnesses, the basic facts alleged, the anticipated length of the trial, the rules about not communicating with anyone or being exposed to media coverage during the trial, the procedural aspects of the capital trial at issue, and the need for jurors to be able to consider all of the punishment options that could eventually come before them, including death.

**24.** In September of 2007, Parker's trial attorneys filed a "Motion for Individual Sequestered Voir Dire," as well as a "Motion to Submit Questionnaire to Members of the Jury Panel." And at a pre-trial hearing held in December of 2007, one month before Parker's January 2008 trial, defense counsel argued that using the questionnaire would help "weed out some of the people" more efficiently; and the State agreed to the use of the proposed questionnaire. Defense counsel also argued the benefits of individual sequestered voir dire, particularly in a capital case such as Parker's. Defense counsel suggested that the court initially pick out 40 names of prospective jurors, to allow the parties to focus on the question-

In fact, the seven-page jury questionnaire that was used in this case was the exact one proposed by defense counsel.[25]

¶ 15 The actual jury selection process, however, did not go nearly so "efficiently" as hoped. When the first prospective juror was brought in, the trial court began by briefly asking her about some issues that were raised by her questionnaire responses, as well as her willingness to consider all three punishment options for first-degree murder. The prosecutor followed up by asking about the juror's daughter, who had a drug conviction, the juror's attitude toward punishment and the criminal justice system, and the juror's exposure to marital infidelity, including that of her own spouse.[26] Defense counsel then questioned the prospective juror extensively about her experiences and views regarding things such as the presumption of innocence, any exposure to facts of the case through the news or working at the Michelin plant, her daughter's case, her own experience of marital infidelity, her attitude toward guns, what sentences the prospective juror would be willing to give for various "hypothetical" murder situations, etc.[27] In addition, defense counsel presented what were essentially mini-lectures to the prospective juror about how different drug crimes are categorized, how different homicides are categorized, the job of the criminal defense law-

yer, the law regarding voluntary intoxication and heat-of-passion manslaughter, the two-stage process of a death penalty trial, the obligation of a juror to respect the moral judgments of other jurors, the history of the Fifth Amendment and a defendant's Fifth Amendment rights, and the meaning of and law regarding "circumstantial evidence." [28]

¶ 16 The voir dire process for the next two jurors was similar. And by lunchtime on the first day, the trial court expressed impatience with the slow progress that was being made and warned that the court might consider imposing time limits.[29] Surprisingly, however, the lecture-style "questioning" of Parker's counsel only grew more expansive (and long-winded) after the lunch break. Over the course of that afternoon, the trial court repeatedly warned defense counsel that he was supposed to be asking actual questions and repeatedly ordered counsel to "move along," with no noticeable impact on counsel's approach to voir dire.

¶ 17 The next morning the trial court announced that it was moving to "Plan B." From that point forward, the court conducted its own, rather extensive voir dire of each potential juror, after which each of the parties was allowed five additional minutes to question each juror. Defense counsel objected repeatedly and vigorously to this time

naires of the ones that would be questioned first. The court complied, but started with 30 names.

**25.** The questionnaire was attached to Parker's motion seeking the use of such a questionnaire. The questions contained therein sought information from each juror regarding the following: juror's name; length of time lived and area lived (town or country) in the county; educational and employment background of juror, juror's spouse, and any children; juror's military experience, media preferences and sources of "news"; juror's business and social organizations, church attendance/leadership, and leisure activities; prior jury service; friends and family who have been incarcerated, work in law enforcement or government, or have been victims or defendants; gun ownership and attitudes; three "prominent people" that juror admires and three that juror dislikes (and why); exposure to facts of case at issue; opinions about appropriate punishment for first-degree murder and willingness to consider all three options; attitudes toward presumption of innocence and criminal justice system generally; and whether juror could think of any reason that he/she might not be an appropri-

ate and impartial juror in a first-degree murder case.

**26.** The questioning by the trial court and the prosecutor combined covers 8 transcript pages.

**27.** The State's objection to defense counsel's use of fact-specific hypotheticals was overruled by the trial court. But cf. Black v. State, 2001 OK CR 5, ¶ 19, 21 P.3d 1047, 1058 ("When counsel attempted to ask questions dealing specifically with the facts of this case or to give hypotheticals based on the facts of this case, the trial court properly sustained the State's objections.").

**28.** Defense counsel's exchanges with this first juror cover 34 transcript pages.

**29.** The trial court declared: "[L]et me say that we've been here all morning; we've been through three people. That's unacceptable. At the present time, I am not, repeat, not imposing time limits on the attorneys on individual voir dire, but I may consider it if we can't move the ball a little faster than this."

limitation at trial and challenges it here on appeal.

¶ 18 This Court recognizes that the purpose of voir dire is two-fold: to enable the seating of an impartial jury, by revealing bias and grounds to challenge particular prospective jurors for cause, and to afford the parties with adequate information to permit the intelligent exercise of peremptory challenges.[30] This Court also recognizes that the manner and extent of voir dire questioning is within the discretion of the trial court and that any limitations on the conduct of voir dire will not be disturbed on appeal absent a clear abuse of that discretion.[31] And this Court will not find a clear abuse of that discretion as long as the voir dire questioning is broad enough to afford the defendant a jury free of outside influence, bias, and personal interest.[32]

¶ 19 This Court has reviewed the extensive transcripts of the voir dire in this case. The voir dire and jury selection process in this case (including the day of filling out the questionnaires) lasted four days and comprises nearly 1,000 transcript pages. By comparison, the entire first stage of Parker's trial (through the announcement of the jury's conviction verdicts) lasted two and one-half days; and the second stage of the trial (through the announcement of the sentencing verdicts) lasted an additional one and one-half days.[33] More importantly, this Court notes that the voir dire questioning by the trial court of each individual prospective juror was thorough and fair and covered essentially every topic that the trial attorneys had been asking about, including the following: issues raised by a juror's questionnaire answers; the juror's attitudes toward the presumption of innocence, a defendant's right not to testify, and the sentencing process in a capital case, including each juror's willingness to consider the three possible punishments in a capital case; as well as each juror's experiences and perspectives regarding topics such as alcohol use, gun ownership, and marital infidelity. The record suggests that the trial court was quite effective in covering all the key issues that the parties were asking prospective jurors about, leaving both sides an additional five minutes to probe further as necessary.[34]

¶ 20 This Court recognizes that imposing specific time limits, and in particular, short time limits, on voir dire questioning in a criminal trial, especially a capital trial, raises the very real possibility of prejudicing a defendant's right to a fair jury selection process, a fair trial, and a fair sentencing. In the current case, however, Parker does not even allege that he was afflicted by any kind of actual prejudice at all. Furthermore, this Court's own review of the questionnaires and voir dire of the jurors does not suggest any prejudice.

¶ 21 Instead, Parker claims generally that he was deprived of "a full and fair opportunity to obtain information in order to intelligently exercise his peremptory challenges." Yet Parker fails to identify *any* specific topics or questions that he was actually prevented from covering with the prospective jurors at his trial. He also fails to identify any

**30.** *See Mu'Min v. Virginia*, 500 U.S. 415, 431, 111 S.Ct. 1899, 1908, 114 L.Ed.2d 493 (1991) ("*Voir dire* examination serves the dual purposes of enabling the court to select an impartial jury and assisting counsel in exercising peremptory challenges."); *Young v. State*, 2000 OK CR 17, ¶ 19, 12 P.3d 20, 31 ("The purpose of voir dire examination is to ascertain whether there are grounds to challenge prospective jurors for cause and to permit the intelligent use of peremptory challenges.") (citations omitted); *Black v. State*, 2001 OK CR 5, ¶ 15, 21 P.3d 1047, 1057 (same).

**31.** *Young*, 2000 OK CR 17, ¶ 19, 12 P.3d at 31; *Black*, 2001 OK CR 5, ¶ 15, 21 P.3d at 1057; *see also Hogan v. State*, 2006 OK CR 19, ¶ 13, 139 P.3d 907, 917 (trial court restrictions on voir dire questioning "will not be disturbed on appeal unless the court's decision was clearly erroneous or manifestly unreasonable").

**32.** *Black*, 2001 OK CR 5, ¶ 15, 21 P.3d at 1057; *Young*, 2000 OK CR 17, ¶ 19, 12 P.3d at 32.

**33.** The transcript of Parker's entire capital trial consists of 1844 pages, contained in seven volumes, with an additional volume of exhibits. The first four volumes are of voir dire.

**34.** This Court notes that although the trial court often denied defense counsel's requests for more time, the trial court also granted defense counsel more time, *sua sponte*, on a number of occasions when the questioning of a particular juror had raised new or expanded concerns.

jurors that he would have struck with an additional peremptory challenge, if he had been permitted to question them further.[35]

¶ 22 This Court's review of the extensive voir dire transcripts in this case leads us to the conclusion that Parker and his attorneys had more than enough information with which to intelligently exercise Parker's peremptory challenges in this case. This Court further finds that the trial court's imposition of the five-minute time limit was a direct result of defense counsel's refusal to abide by the court's repeated warnings about conducting voir dire appropriately.[36] Finally, this Court finds that, under the specific circumstances of this case, Parker's rights to a fair and unbiased jury, a reasonable voir dire process, and a fair trial were in no way hindered or prejudiced by the trial court's decision to limit the individual voir dire questioning of both parties to five minutes per juror. This claim is rejected accordingly.

¶ 23 In Proposition II, Parker asserts that the trial court abused its discretion when it refused to grant a mistrial when the State elicited inflammatory and prejudicial evidence from Kim Gilbert, which it had failed to disclose prior to trial. Specifically, the State elicited testimony from Gilbert that Parker had once asked her to help him shoot Watterson, by asking Watterson to meet her in a certain location, where Parker would be hiding out and could shoot him when he arrived. Gilbert further testified that Parker wanted to go to Oklahoma City the next day, so he could get a gun that "couldn't be traced." Remarkably, Gilbert also testified

that she agreed to help Parker, because she was "scared of what [he'd] do." When the prosecutor then began to ask when this conversation took place, defense counsel objected and sought a bench conference. Defense counsel then argued that this evidence had never been disclosed, was very significant, and amounted to "trial by ambush."

¶ 24 After some initial discussion, the trial court declared a recess, in order to more fully investigate and consider what had occurred. During this recess the prosecutor acknowledged that he had learned of the challenged testimony during his final trial preparations, that Gilbert had never previously mentioned the alleged plot, and that the State failed to disclose this new evidence to the defense prior to trial. Defense counsel maintained that the trial court had to grant a mistrial, because there was no way to "unring" the highly prejudicial and undisclosed bell that had just been rung. The trial court agreed that the State should have disclosed the new evidence, which was not fairly raised within previously disclosed evidence, but rules that a mistrial was not warranted.[37] The trial court gave Parker and his attorneys the option of either recessing the trial to question Gilbert, in order to cross examine her about the new evidence, or having the court admonish the jury to disregard the evidence.

¶ 25 After consulting directly with Parker and discussing the exact nature of the admonishment that would be given, defense counsel elected to have the jury admonished to disregard the evidence.[38] The trial court

---

**35.** Cf. Black, 2001 OK CR 5, ¶ 23, 21 P.3d at 1059 (denying relief despite appealing defendant confusion regarding voir dire process, where appealing defendant provided "no specific example of any seated juror who was biased or otherwise could not perform their duty as a juror" and did not "identify [any] jurors he would have stricken with a peremptory").

**36.** This Court notes, however, that Parker cannot establish ineffective assistance on this basis, because he cannot show prejudice from trial counsel's performance in this regard.

**37.** The only previous reference to such a plot was in the recorded conversation between Gilbert and Parker while Parker was in jail. During this recorded conversation, which was disclosed and admitted at trial, Parker refers to Gilbert as

being "involved" in some plan to harm Watterson, but Gilbert responds that she doesn't know what Parker is talking about; and the recording leaves the impression that Parker was simply trying to manipulate Gilbert through a lie.

**38.** While defense counsel was trying to decide which option to choose, the prosecutor requested that he be allowed to ask Gilbert whether she was ever part of an actual "conspiracy" to kill Watterson, with the expectation that Gilbert would say, "no." The trial court wisely declined to allow this question, which would have further emphasized the undisclosed testimony that Parker had previously sought Gilbert's help in a plot to kill Watterson.

then admonished Parker's jury that the testimony before the break, about "some conversation regarding some incident that supposedly may have—that supposedly happened in Oklahoma City," had never been previously disclosed to the defense or to any law enforcement or investigating officer in the case and that it would violate the Rules of Evidence for the jury to consider it. The court then directed the jury "to disregard what you heard about that."

■ ¶ 26 Parker properly preserved his current claim by objecting to the challenged evidence at trial and seeking a mistrial. Parker acknowledges on appeal, however, that in most cases an admonishment cures any error resulting from the elicitation of improper testimony at trial.[39] Specifically, this Court has repeatedly held that an admonishment cures the error from improper testimony or an improper comment at trial, unless the improper testimony or comment was such that it appears to have "determined" the result of the defendant's trial.[40]

¶ 27 This Court does not hesitate to conclude that the trial court's admonishment cured any error from the elicitation of the undisclosed testimony from Gilbert. This testimony certainly did not determine the result of Parker's trial. Parker was convicted of the first-degree murder of Watterson based upon the overwhelming evidence against him on this charge.[41] Although Parker denied that his shooting of Watterson constituted first-degree murder, the State presented more than sufficient evidence to establish that Parker shot Watterson "with malice aforethought." Parker's second claim is rejected accordingly.

■ ¶ 28 In Proposition III, Parker raises a cumulative error claim, arguing that even if no individual error merits relief, the combined effect of the errors in his case entitles him to relief. This Court found no error regarding Parker's Proposition I claim, and that any error regarding his Proposition II claim was cured by the trial court's admonition to the jury. There is no "cumulative error" where only one potential error is found. This claim is rejected accordingly.

¶ 29 After thoroughly considering the entire record before us on appeal, including the original record, transcripts, briefs, and exhibits of the parties, we find that neither reversal nor modification is required under the law and evidence.

## Decision

¶ 30 The Judgment and Sentence of the District Court regarding James Eric Parker is **AFFIRMED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2009), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON, P.J., A. JOHNSON, V.P.J., LUMPKIN, J. and LEWIS, J.: concur.

---

39. *See, e.g., Welch v. State,* 2000 OK CR 8, ¶ 26, 2 P.3d 356, 369–70 ("[W]hen inadmissible evidence or an improper comment is presented to a jury, an admonishment to the jury by the court that the evidence or comment is not to be considered will cure any error.").

40. *Hager v. State,* 1983 OK CR 88, ¶ 9, 665 P.2d 319, 323 ("Normally, such an admonition cures an error unless, after considering the evidence, the [improper] testimony appears to have determined the verdict."); *Al–Mosawi v. State,* 1996 OK CR 59, ¶ 59, 929 P.2d 270, 284 ("A trial court's admonition to the jury to disregard the remarks of counsel or a witness usually cures any error[,] unless it is of such nature, after considering the evidence, that the error appears to have determined the verdict.").

41. Parker does not argue that the challenged evidence could have had any impact on the jury's consideration of the other crimes charged against him.