2011 OK CR 6

**Marlon Dean HARMON, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. D–2008–657.

Court of Criminal Appeals of Oklahoma.

Jan. 27, 2011.

As Corrected April 1, 2011.

Catherine Hammarsten, Jacob Benedict, Assistant Public Defenders, Oklahoma County Public Defender's Office, Oklahoma City, OK, attorneys for defendant at trial.

Steve Deutsch, Scott Rowland, Cindy Truong, Assistant District Attorneys, Oklahoma City, OK, attorneys for State at trial.

Andrea Digilio Miller, Assistant Public Defender, Oklahoma County Public Defender's Office, Oklahoma City, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Oklahoma Attorney General, Jennifer L. Strickland, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## OPINION

A. JOHNSON, Presiding Judge.

¶ 1 Marlon Deon Harmon was tried in the District Court of Oklahoma County, Case No. CF–2004–4956, and found guilty of First Degree Felony Murder in violation of 21 O.S. 2001, § 701.7(B). The jury imposed the death penalty after finding that the murder was especially heinous, atrocious, or cruel, the murder was committed by Harmon while serving a sentence of imprisonment on conviction of a felony, and that Harmon presented a continuing threat to society. *See* 21 O.S.2001, § 701.12(4), (6) and (7). The Honorable Jerry D. Bass, who presided at trial, sentenced him accordingly. From this Judgment and Sentence he appeals, raising twenty-three claims of error. We find none of these claims merit relief and affirm the judgment and sentence.

### FACTS

¶ 2 On August 17, 2004, Appellant Harmon picked up his friend, Jasmine Battle, and asked her to go with him to rob a nearby convenience store.[1] Harmon was driving a green Honda Accord, and had brought a gun. As they neared the Q & S convenience store at 26th Street and Independence in Oklahoma City, Harmon got out of the car and walked to that store while Battle drove around the block. Shortly, she heard three gunshots and saw that Harmon had blood on his hands when he came running back to her. A frightened Battle abandoned the car and left.

¶ 3 A young girl riding her bicycle across from the store saw Harmon run out of the store. He was clutching money in one hand and a gun in the other. She watched him run away and saw Kamal Choudhury, the owner of the store, run out and fall to the ground. She tried to call 911 from a pay phone outside the store. Unsuccessful, she then ran home to tell her mother what she had witnessed. Lance Nicholas arrived just as Choudhury emerged from the store. He heard Choudhury calling for help and saw a red substance on his clothes. He called 911 and tried to help Choudhury. When Nicholas asked Choudhury to describe the man who shot him, Choudhury pointed to Nicholas' baseball cap, worn backwards.[2] Choudhury was alert and responsive when he was transported to the hospital, but died early the next morning as a result of the gunshot wounds he sustained during the robbery.

¶ 4 Inside the store responding police officers found a large amount of blood and what appeared to have been the contents of a wallet: money, an I.D. card, and notes. Choudhury's wallet and credit cards were missing. Harmon's palm print was identified on a blood stained piece of paper found

---

1. Battle entered into a plea agreement, cooperated with the State and testified against Harmon.

2. Neighbors in the area saw a man fitting Harmon's description walking toward the store, a green Honda driven by a young African American woman circling the block, and a man running back to the car. Witnesses described Harmon as wearing shorts, a shirt, tennis shoes and a "scarf", "do-rag" or "beanie."

among the contents of the wallet. By the following day, Choudhury's credit cards had been used sixteen times. A card was first used fifteen minutes after the shooting at a gas station located a block away from the apartment Harmon shared with his girlfriend. Cards were also used at gas stations in El Reno and Chandler; witnesses placed Harmon in both towns after the shooting. Battle identified Harmon and one of his friends on the security videotape obtained from the Chandler gas station.

¶ 5 Tyrone Boston provided information to the police about Harmon's involvement in the robbery-murder. Learning of Boston's statement, Harmon responded by saying Boston was a "snitch" and voicing his regret that he had not killed him. Boston claimed to suffer from memory problems at trial, but acknowledged that Harmon had told him that he (Harmon) had been required to "plug" a man. Other facts will be discussed as necessary with Harmon's individual claims of error.

## *DISCUSSION*

### 1.

### Jury Selection: Trial Court's Limitations on Questions

■ ¶ 6 Harmon claims that his constitutional rights to due process and to a fair trial were denied by the limitations the trial court placed on the questions defense counsel was permitted to ask potential jurors during jury selection. He argues he was further prejudiced when the trial court reprimanded his attorney in front of the jury.

■ ¶ 7 The purpose of *voir dire* examination is to discover whether there are grounds to challenge prospective jurors for cause and to permit the intelligent use of peremptory challenges. *Sanchez v. State*, 2009 OK CR 31, ¶ 44, 223 P.3d 980, 997, *cert. denied*, —— U.S. ——, 131 S.Ct. 326, 178 L.Ed.2d 212 (2010). "The manner and extent of *voir dire* lies within the District Court's discretion." *Id.* The District Court may, in its discretion, restrict questions that are repetitive, irrelevant or regard legal issues upon which the trial court will instruct the jury. *Id.* "There is no abuse of discretion as long as the *voir dire* examination affords the defendant a jury free of outside influence, bias or personal interest." *Id.*

¶ 8 Rule 6, *Rules of the District Courts*, Title 12, Ch. 2, App. (2011) instructs:

> The parties or their attorneys shall be allowed a reasonable opportunity to supplement [the District Court's] examination. Counsel shall scrupulously guard against injecting any argument in their voir dire examination and shall refrain from asking a juror how he would decide hypothetical questions involving law or facts. Counsel shall avoid repetition, shall not call jurors by their first names or indulge in other familiarities with individual jurors, and shall be fair to the court and opposing counsel.

¶ 9 The limitations imposed upon defense *voir dire* in this case were proper. The trial court excluded inquiry designed to elicit answers based on facts that were not before the jury or about matters on which the court would instruct.[3] The record shows that defense counsel was permitted to question the potential jurors at length about their atti-

---

3. For example, defense counsel asked prospective juror P if he would favor one punishment in particular if he found the murder was premeditated and without excuse. The court allowed the prospective juror to answer but admonished defense counsel at the bench to refrain from asking questions that require the juror to commit to a position based on a set of facts. The trial court disallowed defense counsel's question to prospective juror P about his reaction should the death penalty be abolished tomorrow. The trial court also limited defense counsel's question to prospective juror C about which punishment he would favor if the State proved Harmon killed a convenience store clerk. The trial court inter-

rupted defense counsel after he asked prospective juror M about considering mitigating evidence in deciding punishment. It appears the district court wanted to prevent defense counsel from asking how specific mitigating evidence applicable in this case would affect the potential juror's punishment decision. The trial court also intervened after defense counsel asked a potential juror to elaborate on the kinds of circumstances that would warrant the death penalty. Lastly, the district court sustained the State's objections to questions about what the jurors thought were proper circumstances to consider in deciding punishment and what circumstances jurors thought deserved the death penalty.

tudes toward the death penalty, including questions such as: is life imprisonment without the possibility of parole a serious punishment; do you support the death penalty; do you consider yourself a strong or weak supporter of the death penalty; should the death penalty be reserved for only the worst cases; would you be open to hearing mitigating evidence; do you favor one punishment over another; is the decision whether to impose the death penalty a serious one; are there too many steps required to impose a death sentence; do you think this is a decision that will stay with you for years; and will you just pay lip service to considering all three punishments. The district court's limitations did not prevent defense counsel from fully exploring the potential jurors' views on the death penalty. The *voir dire* allowed was broad enough to enable defense counsel to challenge prospective jurors for cause and to intelligently exercise peremptory challenges. There is no error here.

¶ 10 Harmon also claims that he was prejudiced when the district court admonished his attorney in front of the jury about his questioning and the amount of time he was taking. We disagree. Defense counsel told the potential jurors that he was a young lawyer and that he had not been in the Public Defender's office very long. He also said that he was bound to make some mistakes. It was no surprise under the circumstances that the district court prompted defense counsel to keep the trial focused on the issue of selecting qualified jurors and to refrain from asking borderline or improper questions. The few times that the district court directed defense counsel to move on or to ask more relevant questions did not subvert the purpose of a well conducted *voir dire*. Furthermore, the court permitted de-

fense counsel sufficient latitude to talk with potential jurors about hobbies or other personal interests.[4] The court's comments that Harmon characterizes as reprimands were mild indeed. We cannot find those few judicial prompts to "move on" resulted in any prejudice to Harmon.

**2.**

### Lack of Jury Questionnaires and Individual *Voir Dire*

¶ 11 Harmon claims that the jury selection process in his case denied him due process because the trial court refused his requests to use jury questionnaires and to allow individual sequestered *voir dire*.[5] He argues that the deprivation of information discoverable through these tools, coupled with the use of the "struck juror" method in this case denied him the full and intelligent exercise of his peremptory challenges.[6]

¶ 12 Harmon did not object to the "struck juror" method of selecting jurors in his case, waiving review for all but plain error. *See Jones v. State*, 2006 OK CR 5, ¶ 9, 128 P.3d 521, 533; *Simpson v. State*, 1994 OK CR 40, ¶ 23, 876 P.2d 690, 698 (plain error is error which counsel failed to preserve through a trial objection, but upon appellate review, is clear from the record and affected the defendant's substantial rights). The "struck juror" method of jury selection has been upheld where the record shows that the defendant was provided "the opportunity to examine each prospective juror to determine whether grounds existed to challenge the juror for cause and was allowed to exercise all of his peremptory challenges provided by law." *Jones*, 2006 OK CR 5, ¶ 8, 128 P.3d at 533. The record shows that Harmon's attorney was allowed to question all

---

4. For example, defense counsel asked a potential juror interested in cooking what her favorite dish was to make. He asked another potential juror interested in reading about the books she enjoyed most. He also asked a potential juror who was in college about his major.

5. Harmon filed a pre-trial motion for the use of jury questionnaires with a proposed questionnaire, and for individual sequestered *voir dire* on the death penalty. The pre-trial request was denied in a motion hearing; the request for

sequestered *voir dire* was renewed during jury selection, but was again denied.

6. Under the district court's "struck juror" method, thirty prospective jurors were called to be questioned by the court and the attorneys. As potential jurors were removed for cause, they were replaced until there was a panel of thirty potential jurors who were passed for cause by the parties. The parties then utilized nine peremptory challenges each, leaving twelve jurors to hear the case.

potential jurors, with an emphasis on their views on the death penalty and the presumption of innocence, and that defense counsel exercised all nine peremptory challenges. Harmon has neither shown that the "struck juror" method affected his substantial rights nor that he was prejudiced by the manner of jury selection employed in his case.

¶ 13 Nor do we find that jury selection was unfair because the trial court refused Harmon's request to conduct individual sequestered *voir dire*. We have left the decision for individual *voir dire* to the discretion of the district court and have rejected requests for a mandatory rule requiring the use of individual sequestered *voir dire* in capital cases. *See Jones v. State,* 2006 OK CR 17, ¶ 16, 134 P.3d 150, 156; *Childress v. State,* 2000 OK CR 10, ¶ 40, 1 P.3d 1006, 1015–16 (individual *voir dire* discretionary with trial court). Individual sequestered *voir dire* is appropriate in certain cases, certainly including those that have been the subject of extensive pretrial news coverage. *See Childress,* 2000 OK CR 10, ¶ 40, 1 P.3d at 1015. The crux of the issue, however, is whether the defendant can receive a fair trial with fair and impartial jurors. *Id.*

¶ 14 Harmon cites two remarks that he claims improperly influenced the jury pool and supported his request for individual *voir dire:* 1) a juror stated he thought Harmon looked familiar—possibly from seeing him on television; and 2) he (the same juror) knew several of the police officers expected to testify and thought they were "good guys." In reviewing this type of claim, we give great deference to the district court's opinion of the candor of potential jurors. This is so because the judge sees the potential jurors and hears their responses. *Id.* at ¶ 41, 1 P.3d at 1015. The trial judge in this case observed the potential jurors and found no need for individual *voir dire*. The prospective juror who said he may have seen Harmon on television and admitted a bias in favor of police officers was removed for cause. There is no evidence showing his remarks tainted the other potential jurors who heard them or that Harmon was preju-

diced by the district court's decision to deny his request for individual *voir dire*. The district court did not abuse its discretion.

¶ 15 Nor can we find that the district court's decision to disallow a jury questionnaire in this case amounts to an abuse of discretion. While the use of jury questionnaires is not required,[7] We have noted their value as a screening tool in capital cases. *See Eizember v. State,* 2007 OK CR 29, ¶ 40 n. 6, 164 P.3d 208, 221 n. 6. In this case, however, defense counsel was allowed to thoroughly question prospective jurors about their views on the death penalty and about other relevant issues for the purpose of making challenges for cause and making intelligent peremptory challenges.

¶ 16 Significantly, Harmon does not identify any specific question he would have asked on a questionnaire that he did not ask, or could not have asked, during oral *voir dire*. We cannot find, therefore, that Harmon's constitutional right to due process was violated by the district court's decision not to allow juror questionnaires.

### 3.

### Erroneous Removal of Jurors for Cause

¶ 17 Harmon claims that the trial court failed to follow the proper procedure in excusing eleven panelists for cause because of the panelists' views on the death penalty. He argues that the district court judge did not ask the proper questions of potential jurors and that the judge should have given his attorney a chance to question panelists before they were excused as unable to consider the death penalty.

¶ 18 A prospective juror in a capital case must be excused for cause when the juror's views on capital punishment would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). "Due process of law requires that a prospective juror be willing to consider all the penalties provided by law and not be irrevocably committed

---

7. Notes on Use to OUJI–CR(2d) 1–10 (use of juror questionnaire is discretionary).

930

to a particular punishment before the trial begins." *Sanchez*, 2009 OK CR 31, ¶ 44, 223 P.3d at 997. The *Witt* standard, however, does not require a juror's bias to be proved with unmistakable clarity; nor does it require the juror to express an intention to vote against the death penalty automatically. *Witt*, 469 U.S. at 424, 105 S.Ct. at 852. "[D]eference must be paid to the trial judge who sees and hears the jurors". *Id.*, 469 U.S. at 425, 105 S.Ct. at 853. *See also Grant v. State*, 2009 OK CR 11, ¶ 17, 205 P.3d 1, 11, *cert. denied*, —— U.S. ——, 130 S.Ct. 404, 175 L.Ed.2d 276 (2009)(deference to the trial court is appropriate because it is able to personally observe the panelists, and take into account a number of non-verbal factors that do not transfer well, if at all, to the transcript page).

¶ 19 The *Witt* standard requires only that each juror be willing to consider each of the three statutory punishments: the death penalty, life imprisonment without the possibility of parole, and life imprisonment with the possibility of parole. *Hogan v. State*, 2006 OK CR 19, ¶ 17, 139 P.3d 907, 918. We review a juror's *voir dire* examination in its entirety to determine if the trial court properly excused the juror for cause. *Jones v. State*, 2009 OK CR 1, ¶ 14, 201 P.3d 869, 877, *cert. denied*, —— U.S. ——, 130 S.Ct. 237, 175 L.Ed.2d 163 (2009). As noted above, we generally defer to the impressions of the trial court, because it can better assess whether a potential juror would be unable to fulfill his or her oath. *Id.; see also Miller–El v. Cockrell*, 537 U.S. 322, 339, 123 S.Ct. 1029, 1041, 154 L.Ed.2d 931 (2003) ("Deference [on jury-selection issues] is necessary because a re-viewing court, which analyzes only the transcripts from *voir dire*, is not as well positioned as the trial court to make credibility determinations").

¶ 20 The eleven prospective jurors identified by Harmon were all examined by the district court. Each of them stated unequivocally that under no circumstances would he or she give meaningful consideration to the death penalty. The district court followed up on any response that could be construed as equivocal to assure itself that the prospective juror could not follow the law. Contrary to Harmon's claim, these panelists did not articulate mere generalized objections to the death penalty; rather, each informed the court he or she would not consider the death penalty regardless of the law and evidence.

¶ 21 A review of *voir dire* shows that the district court neither erred in denying defense counsel's request to further question these eleven jurors nor erred in its questioning. "When the proper questions have been asked by the trial court to determine whether prospective jurors can sit in the case, it is not error to deny defense counsel an opportunity to rehabilitate the excused jurors." *Littlejohn v. State*, 2004 OK CR 6, ¶ 49, 85 P.3d 287, 301–02.

¶ 22 The district court judge went through the first part of the question qualifying a capital case juror found in OUJI–CR(2d) 1–5, including the jury's duty to assess guilt and, if necessary, punishment, the three punishment options, the meaning of aggravating and mitigating circumstances, and the weighing process of aggravating and mitigating circumstances.[8] He explained to the panelists that some people would "never" con-

---

8. OUJI–CR(2d) 1–5 provides:

The defendant is charged with murder in the first degree. It will be the duty of the jury to determine whether the defendant is guilty or not guilty after considering the evidence and instructions of law presented in court.

If the jury finds beyond a reasonable doubt that the defendant is guilty of murder in the first degree, the jury will then have the duty to assess punishment. The punishment for murder in the first degree is death, imprisonment for life without parole or imprisonment for life.

You may not consider imposing the death penalty unless you find that one or more aggravating circumstances exist beyond a reasonable doubt. Aggravating circumstances are those which in-crease the defendant's guilt or enormity of the offense. You also may not consider imposing the death penalty unless you unanimously find that the aggravating circumstance or circumstances outweigh any mitigating circumstances which may be present. Mitigating circumstances are 1) circumstances that may extenuate or reduce the degree of moral culpability or blame, or 2) circumstances which in fairness, sympathy or mercy may lead you as jurors individually or collectively to decide against imposing the death penalty. Even if you find that the aggravating circumstance(s) outweigh(s) the mitigating circumstance(s), you may impose a sentence of imprisonment for life with the possibili-

sider imposing the death penalty under any circumstances while others would "always" impose the death penalty for first degree murder. The judge proceeded to ask the panelists to raise their hands if they fell into either one of these categories. He then questioned those panelists individually. He asked which position the panelist held and reminded the panelist that the law required each prospective juror to be able to give meaningful consideration to all three possible punishments. He then confirmed that the panelist was unable to fulfill his or her obligation under the law. Finally, he asked if the panelist was willing to give meaningful consideration to all three penalties provided for by law and not be irrevocably committed to a position before the trial began. Each panelist excused for cause stated firmly that he or she could not consider the death penalty. The court's question about the panelist's unwillingness to consider the death penalty, though not verbatim from OUJI–CR(2d) 1–5, was sufficient to identify those panelists who could not or would not consider the death penalty no matter what the law or facts. *See Williams v. State,* 2001 OK CR 9, ¶ 13, 22 P.3d 702, 710. Based on this record we find the district court did not abuse its discretion in removing these panelists for cause.

### 4.

### Excusal of panelists for cause based on opposition to death penalty violates 22 O.S.2001, § 660(8)

■ . ¶ 23 Harmon claims that 22 O.S. 2001, § 660 prohibits the excusal of a prospective juror on the ground that he or she cannot consider the death penalty.[9] He argues that the removal of such a panelist for cause violates Section 660 because Section 660(8) allows for the removal of only those panelists whose views on capital punishment would prevent them from finding the defendant guilty.[10] We have rejected this claim in the past and we find neither the bifurcated nature of this capital case nor the current practice of jury selection used in capital cases warrants a different conclusion. *See Davis v. State,* 1983 OK CR 57, ¶¶ 21–22, 665 P.2d 1186, 1194; *Gibson v. State,* 1972 OK CR 249, ¶¶ 30–31, 501 P.2d 891, 898. This claim is denied.

### 5.

### District Court erred in failing to dismiss potential juror for cause

■ ¶ 24 Harmon claims the district court's denial of a challenge for cause violated his constitutional rights to due process and a reliable sentencing proceeding. He argues it was error for the district court to deny his request to excuse for cause a panelist who expressed reservations about the importance of mitigating evidence and who ultimately served on his jury.

■ ¶ 25 The State correctly argues that Harmon waived this claim when he failed to preserve it by excusing the challenged panelist with a peremptory challenge and making

---

ty of parole or imprisonment for life without the possibility of parole.
If you find the defendant guilty of murder in the first degree, can you consider all three of these legal punishments—death, imprisonment for life without parole or imprisonment for life—and weigh the aggravating circumstance(s) against the mitigating circumstances to impose the punishment warranted by the law and evidence? **[If the answer to the preceding question is negative]** If you found beyond a reasonable doubt that the defendant was guilty of murder in the first degree and if under the evidence, facts and circumstances of the case the law would permit you to consider a sentence of **death/(imprisonment for life without parole)/(imprisonment for life)**, are your reservations about the penalty of **death/(imprisonment for life without parole)/(imprisonment for life)** so strong that regardless of the

law, the facts and circumstances of the case, you would not consider the imposition of the penalty of **death/(imprisonment for life without parole)/(imprisonment for life)?**

9. Section 660 sets forth the exclusive list of reasons for juror challenges on the ground of implied bias.

10. Section 660 provides:

A challenge for implied bias may be taken for all or any of the following cases, and for no other

. . .

8. If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty of, in which case he shall neither be permitted nor compelled to serve as a juror.

a record of which remaining juror he would have excused had he not been forced to use that peremptory challenge. "We have long held that, in order to preserve an objection to a denial for challenge for cause in voir dire, a defendant 'must demonstrate that he was forced, over objection, to keep an unacceptable juror.'" *Browning v. State*, 2006 OK CR 8, ¶ 8, 134 P.3d 816, 828. This claim is denied.

### 6.

### Privilege Against Self-incrimination

 ¶ 26 Harmon raises several complaints throughout his brief about the admission of a videotaped conversation he had with his co-defendant, Jasmine Battle, while in police custody. (State's Exhibit 30). He argues in this claim that the tape's admission violated his constitutional privilege against self-incrimination.

¶ 27 Shortly after his arrest, Harmon was interviewed by police. He was read his rights and signed a rights waiver. Harmon, however, refused to cooperate and stated several times that he did not want to talk to the detectives. Nevertheless, his interview was not terminated and Harmon ultimately confessed. Afterwards, the detectives who interviewed Harmon went into the neighboring interview room to question Battle, who was reluctant to make a statement. Detective Ricketts explained to her that the police had witnesses that would implicate her in the robbery-murder and asked Battle if she would like to see Harmon. Ricketts' stated reason for allowing Battle to see Harmon was to show her that he was not lying about evidence against her and to prompt her to cooperate. Harmon was brought into Battle's interview room where he told Battle that the police knew everything.

¶ 28 The magistrate suppressed Harmon's confession to police after preliminary hearing because police disregarded Harmon's invocation of his right to remain silent under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See Robinson*

*v. State*, 1986 OK CR 86, ¶ 5, 721 P.2d 419, 421 (invocation of right to remain silent requires the immediate cessation of police questioning and police must "scrupulously honor[ ]" the suspect's invocation of his right). Harmon moved *in limine* prior to trial to exclude any mention of his statement to Battle and the videotape of their conversation. At trial, the district court rejected Harmon's arguments that his statement to Battle was the result of interrogation, that the tape was irrelevant, and that the interview was tainted by the illegality of Harmon's previous confession. During Battle's examination, the prosecutor asked about her arrest and if she cooperated with police from the beginning. Battle explained that she did not cooperate initially, but had a change of heart after police brought Harmon into her interrogation room and he said the police knew everything. The State introduced, over defense counsel's objection, the videotape of the exchange as State's Exhibit 30.[11]

¶ 29 On appeal, Harmon complains about the admission of the videotape. He contends that his statements to Battle were directly related to his unlawfully obtained confession and should have been suppressed under the "fruit of the poisonous tree" doctrine set out in *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). The State conceded at oral argument in this matter that it was error to admit the videotape.

 ¶ 30 This is an unusual situation because Harmon's statements to Battle were not a second confession; his statements, nevertheless, were incriminating and the prosecutor argued to the jury that Harmon's statements to Battle were incriminating. This is not a case, however, where Harmon's statements to Battle amounted to a continuation of the interview that resulted in the suppressing of his confession, a re-initiation of that interview or a second interrogation by police. His statements to Battle were not the result of police interrogation. Nor is this a case where the police sent in Battle to obtain inculpatory statements from Harmon. The officer's motives here were to

---

11. The tape shows Battle asking Harmon what evidence the police have against them and Harmon responding, "everything." (State's Exhibit

30). Harmon makes reference to a video, but most of his statements are unintelligible.

prompt Battle to make a statement rather than to gain incriminating evidence against Harmon. Harmon's willingness to speak to Battle was motivated not only by the fact he had confessed his involvement to police, but also to protect his girlfriend from being wrongly accused of being the driver of the getaway car. Moreover, the detectives neither threatened Harmon nor promised him anything to speak with Battle. Thus, the customary reason to exclude evidence for *Miranda* violations—to curb police from coercing confessions from suspects—is not present with respect to Harmon's conversation with Battle.[12] *See Michigan v. Tucker,* 417 U.S. 433, 447, 94 S.Ct. 2357, 2365, 41 L.Ed.2d 182 (1974).

¶ 31 We do not decide, however, whether admission of a videotape of a defendant's statement under circumstances such as these is error. This is so because we are convinced that admission of the videotape, if error in this case, was harmless beyond a reasonable doubt. First, Battle described the circumstances of her arrest and cooperation with police during her trial testimony before the tape was admitted and played for the jury. Battle explained to the jury the content of the videotape without objection. Admission of the videotape itself was simply cumulative to her testimony.

■ ¶ 32 Second, the properly admitted evidence against Harmon was so convincing that it cannot be said any error stemming from the admission of the videotape affected the verdict in this case. Admission of the videotape is the type of trial error subject to harmless error review under *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). *See Arizona v. Fulminante,* 499 U.S. 279, 295, 111 S.Ct. 1246, 1257, 113 L.Ed.2d 302 (1991)(erroneous admission of coerced confession is subject to harmless error analysis). The question *Chapman* instructs the "reviewing court to

consider is not what effect the constitutional error might generally be expected to have upon a reasonable jury, but rather what effect it had upon the guilty verdict in the case at hand." *Sullivan v. Louisiana,* 508 U.S. 275, 279, 113 S.Ct. 2078, 2081, 124 L.Ed.2d 182 (1993). The Court, in *United States v. Hasting,* 461 U.S. 499, 510–511, 103 S.Ct. 1974, 1981, 76 L.Ed.2d 96 (1983), stated that the question under *Chapman* is whether, absent the constitutional error, it is clear beyond a reasonable doubt that the jury would have returned a guilty verdict. While the test set out in *Chapman* is a strict one, the Supreme Court has not adopted the view that a departure from constitutional procedures should result in automatic reversal, regardless of the weight of the evidence against the accused. *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969). Where the weight of the properly admitted evidence is overwhelming and the prejudicial effect of the inadmissible evidence is insignificant by comparison, the error may be viewed as harmless. *Mayes v. State,* 1994 OK CR 44, ¶ 67, 887 P.2d 1288, 1307; *see also Chase v. Crisp,* 523 F.2d 595, 598 (10th Cir.1975).

■ ¶ 33 In gauging the prejudicial effect of the admission of improper evidence or testimony, the Supreme Court in *Harrington* instructs a reviewing court to focus upon the probable impact of inadmissible evidence upon the minds of "an average jury." *Harrington,* 395 U.S. at 254, 89 S.Ct. at 1728. Harmon's presence at the crime scene was established by his palm print in blood on a piece of paper behind the store counter; an eyewitness identification of Harmon as the man seen running from the store with a gun immediately before the bleeding victim emerged and collapsed; the testimony of an accomplice that she drove Harmon to commit the robbery, heard gunshots, and upon his return to the car saw blood on Harmon's

---

**12.** In *United States v. Tyler,* 164 F.3d 150, 158 (3d Cir.1998), the court set forth factors to decide the extent to which a second inculpatory statement was the result of the police's prior misconduct in failing to honor a suspect's invocation of his right to remain silent. The factors include: 1) who initiated the interview leading to the second statement; 2) the time that elapsed between the two interrogations; 3) the extent to which the same police were involved in both interrogations; 4) the manner in which the second interrogation was conducted; and 5) any other factor that is relevant to deciding whether police exploited their prior disregard of the suspect's right to remain silent in obtaining the second statement. *Id.*

hands; evidence that Harmon used the victim's stolen credit cards within fifteen minutes of the robbery as well as several other times over the next day; and evidence that Harmon had told an associate he had to "plug" a man. We conclude that the minds of an average jury would not have found the State's case significantly less persuasive had the videotape of Harmon's statements to Battle been excluded. Our review of the record leaves us with no reasonable doubt that the jury would have reached a different verdict without hearing the videotape. We find any error in the admission of the videotape did not contribute to the verdict in this case and was harmless beyond a reasonable doubt.

## 7.

### Other Crimes Evidence

¶ 34 Harmon complains that he was denied a fair trial by the admission of improper other crimes evidence, namely Harmon's statement to police that he should have killed the "snitch," Tyrone Boston, and evidence Harmon had committed other robberies. We review a district court's decision to admit evidence for an abuse of discretion. *Goode v. State*, 2010 OK CR 10, ¶ 44, 236 P.3d 671, 680.

¶ 35 Detective Lord testified that he was escorting Harmon to the police department from the county jail for photographs. According to Lord, Harmon volunteered that he had discovered that Tyrone Boston had been talking to detectives. Harmon called Boston a "snitch" and said "I should have killed that motherfucker."

¶ 36 Evidence of Harmon's statements about Boston was admitted into evidence over his objection. Harmon had moved *in limine* to exclude this evidence on the basis that it was more prejudicial than probative. The district court disagreed. Harmon reurged his objection prior to the admission of his statement. Harmon's failure to argue below that the statement was inadmissible other crimes evidence waives the issue on

appeal and review is for plain error only. *See Myers v. State*, 2006 OK CR 12, ¶ 27, 133 P.3d 312, 324 (when a specific objection is made at trial, this Court will not entertain a different objection on appeal.)

¶ 37 Harmon's statement that he should have killed Boston is not evidence of another crime prohibited under 12 O.S.2001, § 2404.[13] Rather, it is an expression of a bad thought concerning his regret for not committing a crime. The statement showed Harmon's hostility towards the man whom he believed reported his involvement in the murder to the police. This expression of anger toward a perceived "snitch" tended to establish his identity as the killer. 12 O.S.2001, § 2401. The jury was presented with the circumstances surrounding the making of Harmon's statement about Boston and had the opportunity to view Boston and to assess his credibility and motivations during his testimony. The district court did not err in finding the statement was not more prejudicial than probative and admitting it.

¶ 38 Next, Harmon complains that he was prejudiced by the admission of evidence in the first stage of trial that he had committed other robberies. At trial during the testimony of Tyrone Boston, the State played a segment of his taped interview with police to refresh his memory and to impeach him with the statements he made to police implicating Harmon. The prosecutor unintentionally failed to stop the tape before Boston's statement that someone, possibly Harmon, robbed stores. Defense counsel objected and moved for a mistrial because the district court had sustained a motion *in limine* to exclude evidence of other robberies in the first stage of trial. The district court held a hearing outside the presence of the jury to consider the error. The judge listened to the tape three or four times and still reported difficulty in determining whether Boston referred to a robbery or robberies, although the syntax indicated that Boston used the plural "robberies" rather

**13.** Title 12 O.S.2001, § 2404(B) governs the admission of evidence of other crimes, wrongs, or bad acts, and specifically prohibits evidence intended to prove a character trait of a person in order to show the person acted in conformity with that trait. Other crimes evidence is permissible, however, to prove motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Id.*

than the singular "robbery." In an attempt to determine the proper remedy for the error, the district court asked each juror individually what he or she last heard on the tape. Five jurors indicated that they could not understand what was being said or could not remember what they had last heard. Of the rest, only Juror S.R. indicated that it was about Harmon and possibly others robbing stores.[14] After listening to argument, the district court overruled the motion for mistrial and elected to admonish the jury. The court admonished the jury:

> that anything that you thought you heard or may have heard on the video is not part of the record and is not to be included in any of your discussions or deliberations.

¶ 39 Harmon claims, without explanation, that the admonishment was insufficient to purge the taint of the statement. We disagree. Harmon acknowledges on appeal that in most cases an admonishment cures error resulting from the admission of improper testimony at trial. "Specifically, this Court has repeatedly held that an admonishment cures the error from improper testimony or an improper comment at trial, unless the improper testimony or comment was such that it appears to have 'determined' the result of the defendant's trial." *Parker v. State,* 2009 OK CR 23, ¶ 26, 216 P.3d 841, 849; *see also Welch v. State,* 2000 OK CR 8, ¶ 26, 2 P.3d 356, 369–70; *Al–Mosawi v. State,* 1996 OK CR 59, ¶ 59, 929 P.2d 270, 284.

¶ 40 We do not hesitate to conclude that the district court's admonishment cured any error from the playing of Boston's taped statement. This inadvertent evidence did not determine the result of Harmon's trial. The admonishment given, moreover, was broader than the one originally proposed and was beneficial to Harmon because it advised jurors to disregard the entirety of Boston's

statements on the tape, not merely the challenged statement.[15]

¶ 41 Harmon also contends the fact that the State introduced evidence in the second stage that Harmon had committed other robberies caused the jury to believe the defense was hiding evidence in first stage. As noted above, only one juror understood Boston to have said that someone, possibly Harmon, used to rob stores. The jury was instructed to disregard Boston's statement on the videotape and to refrain from speculation about objections. Further, there is no evidence in the record to support Harmon's contention that the jury concluded that the defense was hiding evidence. If anything, the court's admonishment to disregard Boston's statement indicates that the defense was not hiding evidence, but rather that the State had tried to introduce inadmissible evidence. We are convinced that the district court's admonishment cured any error. This claim is rejected.

### 8.

### Extra-judicial Identification

¶ 42 Harmon argues that the eyewitness identification of him by the young girl near the convenience store was tainted by the fact that she saw a photograph of him on the television news. Harmon did not object to her identification at trial; review is for plain error only.[16] *See Myers,* 2006 OK CR 12, ¶ 27, 133 P.3d at 324; *Cole v. State,* 1988 OK CR 288, ¶ 6, 766 P.2d 358, 359.

¶ 43 A conviction based on "eyewitness identification at trial following a pretrial identification by photograph will be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States,* 390 U.S.

---

**14.** Juror S.R. said the statement was "something like that's what we used to do go rob stores or that's what he used to do is go rob stores."

**15.** The district court proposed out of the presence of the jury: "anything that you may have thought that you heard at the end of the video, right before the objection, is not part of the record and not to be considered during any part of your deliberations."

**16.** Usually reliability is determined by the trial court in an *in camera* hearing upon objection by defense counsel. In the present case defense counsel did not object to eye-witness identification, and thus did not trigger the trial court's determination of reliability. Instead defense counsel cross-examined the witness extensively to expose weaknesses in her identification.

377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). A claim that a pretrial identification procedure was unduly prejudicial or suggestive is evaluated in light of the totality of the surrounding circumstances. *Id.* at 383, 88 S.Ct. at 970; *Cole,* 1988 OK CR 288, ¶ 7, 766 P.2d at 359.

¶ 44 The record shows that T.A. was twelve-years-old and across the street on her bicycle when she saw a man run out of the Q & S convenience store with a gun in one hand and money in the other. She claimed the man stared at her and pointed the gun at her. That night, she gave the police a physical description of the man: tall, dark skinned, black man wearing a white t-shirt, blue jeans and a dark-colored "do-rag." In the days following the murder, the young witness worked with a police sketch artist to create a composite sketch of the suspect. She explained that some time after the murder her mother pointed to a story about the murder on the news and she saw pictures of three people (two men and one woman), and she recognized one of the men as the man she saw running from the store the night of the murder. T.A. identified a picture of the three people shown on the news and said the man she saw running was the first photograph on the far left. She was sure the man pictured on the far left in State's Exhibit 55 (Harmon) was the man she saw running from the store. On re-direct examination, the young witness testified that she did not remember everything she told police, in part because she was consumed with fear as the result of a friend saying the killer would come after her if he got out. The prosecutor then asked the girl if her fear had caused her to be untruthful about anything and she said that she had not been honest when the prosecutor asked her earlier if she saw the man from the store in the courtroom. At that point she identified Harmon as the man she saw running from the store based on her memory from the day of the murder.

¶ 45 Under these circumstances, we find the witness's viewing of Harmon's photograph among the others in the news broadcast was not so impermissibly suggestive to create a substantial likelihood of irreparable misidentification. Further, even if the pre-trial procedure of her identification could be considered unduly suggestive, her courtroom identification of Harmon was reliable under the totality of the circumstances. There are several factors to consider in determining whether the courtroom identification was tainted by a pre-trial confrontation, including (1) the prior opportunity of the witness to observe the defendant during the alleged criminal act; (2) the degree of attention of the witness; (3) the accuracy of the witness's prior identification; (4) the witness's level of certainty; and (5) the time between the crime and the confrontation. *Cole,* 1988 OK CR 288, ¶ 8, 766 P.2d at 360.

¶ 46 T.A. had an adequate opportunity to view Harmon running from the store in daylight conditions. Her description of the man she saw matched Harmon and the clothes that he was wearing that day. She identified Harmon when she saw him on the news. Her description was detailed and she was positive in her identification of Harmon in the photograph and at trial. In addition, only a short time had passed between the day she saw a man run from the store and the news broadcast. Under the totality of the circumstances, Harmon has not shown admission of the witness's courtroom identification was plain error.

## 9.

### Evidentiary Issues

¶ 47 Harmon claims that he was denied a fair trial by the admission of irrelevant and highly prejudicial evidence. Specifically, he contends that it was error to admit the 911 audiotape (State's Exhibit 46), ammunition boxes seized from Chris Lancaster's mother's house (State's Exhibits 37 & 38), and the videotape of Harmon's conversation with Battle (State's Exhibit 30). We review a trial court's evidentiary rulings for an abuse of discretion. *Jackson v. State,* 2006 OK CR 45, ¶ 48, 146 P.3d 1149, 1165.

¶ 48 Harmon did not object to the admission of the 911 tape below, making our review for plain error only. *Malone v. State,* 2007 OK CR 34, ¶ 59, 168 P.3d 185, 210. The Rules of Evidence provide that relevant evidence may be excluded if its pro-

bative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise. 12 O.S.Supp. 2002, § 2403. "When measuring the relevancy of evidence against its prejudicial effect, the court should give the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *Mitchell v. State,* 2010 OK CR 14, ¶ 71, 235 P.3d 640, 657; *see also Mayes v. State,* 1994 OK CR 44, ¶ 77, 887 P.2d 1288, 1310.

¶ 49 Harmon complains that the 911 tape was irrelevant in the first stage of trial and that its relevance was outweighed by the danger of unfair prejudice in the second stage because it reflects the victim's suffering. We disagree. The 911 recording was properly admitted in the trial's first stage to corroborate witnesses' testimony about the condition of the victim as well as the conversation had between the victim and Lance Nicholas, the man who made the 911 call. *See Jones,* 2009 OK CR 1, ¶ 61, 201 P.3d at 886 (approving the use of 911 recordings to corroborate witness testimony.) The victim's audible moans do not render the recording more prejudicial than probative. In addition, the 911 tape was properly admitted in the trial's second stage to support the aggravating circumstance that the murder was especially heinous, atrocious or cruel because it showed the victim's conscious physical suffering before his death. The fact that Harmon did not contest the suffering of the victim did not make the recording more prejudicial than probative. The State had the burden to prove each aggravating circumstance beyond a reasonable doubt and the 911 tape was convincing proof. Harmon has not shown that admission of the 911 tape was error.

¶ 50 Harmon complains that it was error to admit an empty .38 special ammunition box and a 9 millimeter ammunition box found during the search of Chris Lancaster's mother's house. Chris Lancaster was originally arrested for the victim's murder along with Jasmine Battle (Lancaster's girlfriend) and Harmon. His mother lived a few blocks away from the Q & S convenience store.

Defense counsel moved unsuccessfully to exclude the boxes on the basis that there was no connection between the ammunition boxes and Harmon. The State argued the house was a base of operation for Harmon and Lancaster, who had committed other robberies together. The district court allowed the admission of the ammunition boxes, over objection, during the testimony of Detective Lord, who had found evidence tending to show dominion and control by both Lancaster and Battle within Lancaster's mother's house.

¶ 51 The ammunition boxes were relevant and properly admitted. The State introduced a bloodstained bullet found on the floor behind the store counter and one recovered from the victim's body. The bullets were both .38 caliber and were fired from the same gun. The gun that fired the bullets was likely a .38 special or a .357 Magnum, but a 9 millimeter and a .357 Sig could not be excluded. Harmon and Lancaster were friends and Harmon spent considerable time at Lancaster's mother's house. Harmon picked up Battle from this house immediately before the robbery. The fact that an empty ammunition box for the same caliber bullet used in the murder was found at the last place Harmon stopped before the murder makes it somewhat more probable that he committed the murder. The evidence was relevant and not unfairly prejudicial. The trial court did not abuse its discretion in admitting the boxes.

¶ 52 Lastly, Harmon raises his final complaint about the admission of his videotaped conversation with Battle at the police station. He argues it was error to admit the videotaped conversation because his statements and Battle's statements do not specifically and clearly relate to the robbery of the Q & S convenience store. He claims that the tape lacked probative value. He further maintains that the tape was "highly prejudicial as it put the jury on notice that Mr. Harmon had cooperated with authorities" and "enabled the State to infer there was a confession when the confession itself was suppressed."

¶ 53 The tape certainly had probative value. It is obvious Harmon's conversation with Battle did relate to the robbery and murder at the Q & S store. The murder was the reason the police brought him and Battle to the police station. Nor was the tape more prejudicial than probative. While the circumstances could have lead Harmon's jury to conclude that he had provided some degree of assistance to law enforcement, there is no error here because neither the tape itself nor the prosecution referred to his suppressed confession. We find that the district court did not abuse its discretion in admitting the videotape.

### 10.

### Constitutionality of Death Penalty for Felony Murder

¶ 54 Harmon argues death sentences in felony murder cases generally, and in his case specifically, violate the Eighth Amendment ban against cruel and unusual punishment. He asks this Court to vacate his death sentence and modify his sentence to either life imprisonment without the possibility of parole or life imprisonment with the possibility of parole.

¶ 55 The United States Supreme Court and this Court have held that the Eighth Amendment permits the execution of a defendant who actually perpetrated a killing during the commission of a felony. *See Enmund v. Florida,* 458 U.S. 782, 798, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140 (1982); *Tison v. Arizona,* 481 U.S. 137, 150, 107 S.Ct. 1676, 1684, 95 L.Ed.2d 127 (1987); *Warner v. State,* 2006 OK CR 40, ¶ 116, 144 P.3d 838, 877; *Liles v. State,* 1985 OK CR 73, ¶ 26, 702 P.2d 1025, 1032–33. Here, the evidence showed that Harmon actually killed the victim. We find Harmon's argument that impo-

sition of the death penalty violates the Eighth Amendment in all felony murder cases, and particularly this one, unpersuasive; further he provides no relevant authority in support of this claim. The evidence against Harmon rendered him eligible for the death sentence. This claim is rejected.

### 11.

### The Reasonable Hypothesis Standard and OUJI–CR(2d) 4–77

¶ 56 Harmon claims that the trial court committed reversible error when it removed the "reasonable hypothesis" test, over objection, from the instruction regarding the use of circumstantial evidence to prove aggravating circumstances in OUJI–CR(2d) 4–77.[17] The district court modified OUJI–CR(2d) 4–77 to make the first and second stage instructions on circumstantial evidence uniform and consistent with this Court's holding in *Easlick v. State,* 2004 OK CR 21, 90 P.3d 556.

¶ 57 In *Lay v. State,* 2008 OK CR 7, ¶ 29, 179 P.3d 615, 623, this Court found a trial court's modification of the second-stage circumstantial evidence instruction to comport with *Easlick* was error because *Easlick* did not specifically address that instruction. The *Lay* court found that "the 'reasonable hypothesis' instruction is still the required jury instruction for aggravating circumstances proven, entirely or in part, by circumstantial evidence." *Id.*

¶ 58 The *Easlick* decision did not address OUJI–CR(2d) 4–77, but the reasoning in *Easlick* makes it logical to apply to this second-stage instruction as well. In *Easlick,* the Court abandoned the "reasonable hypothesis" test to review appellate claims of insufficient evidence in cases based entirely

17. OUJI–CR(2d) 4–77 provides:
The State relies **[in part]** upon circumstantial evidence for proof of the aggravating **circumstance(s)** of **[Specify the Aggravating Circumstance(s) That Is/Are Applicable]**. In order to warrant a finding of any aggravating circumstance or circumstances upon circumstantial evidence, each fact necessary to prove the existence of the circumstance must be established by the evidence beyond a reasonable doubt. All the facts necessary to such proof must be consistent

with each other and with the conclusion the State seeks to establish. All of the facts and circumstances, taken together, **must be inconsistent with any reasonable theory or conclusion other than the existence of the aggravating circumstance. All of the facts and circumstances, taken together,** must establish to your satisfaction the existence of the aggravating circumstance beyond a reasonable doubt.
The district court's instruction removed the underlined portion of the uniform instruction.

on circumstantial evidence and adopted the standard for cases involving direct and circumstantial evidence to use in all future cases regardless of the type of evidence used to convict. *Easlick,* 2004 OK CR 21, ¶ 4, 90 P.3d at 557. The *Easlick* court reasoned that because the "reasonable hypothesis" test was "based on antiquated ideas concerning the value of circumstantial evidence and because we have a test that can be utilized in a universal manner, the 'reasonable hypothesis' test should meet its demise in this State in accord with the vast majority of jurisdictions." *Easlick,* 2004 OK CR 21, ¶ 15, 90 P.3d at 559. To comport with the decision, the Court modified the uniform first-stage instruction on circumstantial evidence. *Id.,* 2004 OK CR 21, ¶ 15 n. 3, 90 P.3d at 559 n. 3. We find, based on the reasoning of *Easlick* and the facts of this case, that the trial court did not err in removing the "reasonable hyposthesis" test in its modification of OUJI–CR(2d) 4–77.[18]

## 12.

### Cautionary Eyewitness Identification Instruction

■■■ ¶ 59 Harmon claims that the district court should have included a cautionary eyewitness identification instruction in the second stage jury instructions. Harmon maintains that the instruction was necessary because Scott Nevez identified Harmon as the man who robbed him while he was working at Sam's Wholesale Liquor. Harmon did not request the instruction; review is for plain error only. *Hogan,* 2006 OK CR 19, ¶ 38, 139 P.3d at 923.

¶ 60 A cautionary eyewitness identification instruction was given in the first stage and the first stage instructions were incorporated into the second stage instructions. Under these circumstances, we find no error.

**18.** We refer this matter to the Oklahoma Uniform Instruction Committee (Criminal) for promulgation of a modified instruction regarding the use of circumstantial evidence to prove aggravating circumstances.

## 13.

### Validity of the Jury's Finding that Harmon Posed a Continuing Threat

■■ ¶ 61 Harmon argues that his death sentence must be vacated because the State relied upon evidence of a robbery charge of which he was later acquitted to support the aggravating circumstance that he posed a continuing threat to society.[19] Harmon admits that the Supreme Court and other courts have held that the admission of acquitted conduct in sentencing proceedings is permissible provided the conduct is proven by a preponderance of the evidence. *See United States v. Watts,* 519 U.S. 148, 157, 117 S.Ct. 633, 638, 136 L.Ed.2d 554 (1997). He contends, however, that *Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988) and *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), render the decision in *Watts* obsolete, because *Watts* did not require evidence supporting the aggravating circumstance to be proven beyond a reasonable doubt in a capital sentencing proceeding. He maintains that the beyond a reasonable doubt standard is the only standard that ensures reliability of evidence in a capital sentencing proceeding. Without testing unadjudicated offenses with the beyond a reasonable doubt standard, he argues that evidence of unadjudicated crimes should be excluded altogether from the penalty phase.

■■ ¶ 62 We have long recognized that "unadjudicated offenses linked to a defendant in a capital case may be introduced to support the claim of future dangerousness." *Sanchez,* 2009 OK CR 31, ¶ 69, 223 P.3d at 1003, *quoting, Walker v. State,* 1986 OK CR 116, ¶ 46, 723 P.2d 273, 285. As recently as December 14, 2009, this Court said, "[a] defendant's conviction or acquittal of a criminal charge neither alters the basic evidentiary facts of the underlying conduct, nor determines whether those facts may be offered to show his future dangerousness in a capital

**19.** The store manager of Sam's Wholesale Liquor testified in Harmon's capital sentencing proceeding that Harmon was one of the men who robbed him in April 2004. Toby Overstreet testified that he committed the robbery with Harmon, Chris Lancaster and Jasmine Battle.

sentencing trial." *Sanchez*, 2009 OK CR 31, ¶ 70, 223 P.3d at 1004. Evidence of a capital defendant's violent acts is relevant and admissible to show the existence of a probability the defendant poses a continuing threat, "whether those acts resulted in a conviction of the actual offense, some related or lesser included offense, or no conviction at all." *Id.*

■ ¶ 63 A review of the *Johnson* case cited by Harmon shows that it is easily distinguishable from this one. Further, Harmon has cited no authority holding that *Ring* requires offenses offered to prove future dangerousness be proven beyond a reasonable doubt. Rather, *Ring* requires only that the aggravating circumstance to support a death verdict be proven beyond a reasonable doubt. The focus of capital sentencing centers on the individual defendant's record and character. Harmon's robbery of the Sam's Wholesale Liquor store, along with evidence of three other robberies he committed, was relevant to the jury's consideration of his future dangerousness and his future dangerousness was proven beyond a reasonable doubt. This claim is denied.[20]

### 14.

### Use of Unadjudicated Offenses

¶ 64 Harmon argues the use of unadjudicated offenses to prove future dangerousness violates due process for three reasons. First, unadjudicated crimes are evidence of a defendant's propensity for violence and propensity evidence is strictly prohibited in almost every other context within the criminal justice system. Second, the unadjudicated offenses need not be proven beyond a reasonable doubt, creating unreliability in the capital sentencing proceeding. And third, jurors who have convicted a defendant of first degree murder cannot impartially decide his guilt on unadjudicated offenses in second stage.

¶ 65 This Court has upheld the use of unadjudicated offenses to prove, in a capital sentencing proceeding, that a defendant posed a continuing threat to society. *See Mitchell*, 2010 OK CR 14, ¶ 84, 235 P.3d at 659, *Goode*, 2010 OK CR 10, ¶ 71, 236 P.3d at 685, *Sanchez*, 2009 OK CR 31, ¶ 69, 223 P.3d 980, 1003; *Paxton v. State*, 1993 OK CR 59, ¶ 37, 867 P.2d 1309, 1322. Harmon argues now that these holdings are in conflict with our prohibition against the admission of propensity evidence. We disagree.

■ ¶ 66 In *Paxton*, 1993 OK CR 59, ¶ 34, 867 P.2d at 1321, we noted that while propensity evidence is generally inadmissible, there is an exception in capital sentencing proceedings. Capital sentencing proceedings are designed to present the sentencer with as much evidence about the record and character of the defendant as possible when it makes the sentencing decision. *See Gregg v. Georgia*, 428 U.S. 153, 203–04, 96 S.Ct. 2909, 2939, 49 L.Ed.2d 859 (1976). The purpose underlying the prohibition against propensity evidence is not implicated in a capital sentencing proceeding. The purpose of that rule is to assure that the defendant is found guilty, if at all, of the crime charged. The character of the defendant is generally irrelevant to the jury's determination of guilt; it is, however, one of the factors the jury must consider in determining the appropriate punishment. *Paxton*, 1993 OK CR 59, ¶ 41, 867 P.2d at 1323. Therefore, while use of propensity evidence in the first stage potentially renders the jury's verdict unreliable, it is in the second stage an important component in arriving at a sentence that is reasoned and reliable. *See id.*

■ ¶ 67 We conclude the admission of unadjudicated offenses in the sentencing stage of a capital case violates neither due process nor the rule against propensity evidence. We emphasize the finding of the Supreme Court that the jury should receive "as much information as possible when it makes the sentencing decision," *Gregg*, 428 U.S. at 204, 96 S.Ct. at 2939, and that there is an "acute need for reliable decisionmaking when the death penalty is at issue," *Deck v.*

---

**20.** Harmon also claims his death sentence must be vacated because the State dismissed the other robbery cases pending against him so he has never had a jury finding that he committed those robberies beyond a reasonable doubt. The dismissal is irrelevant and the evidence of the other robberies was properly admitted.

*Missouri,* 544 U.S. 622, 632, 125 S.Ct. 2007, 2014, 161 L.Ed.2d 953 (2005) (quotations and citation omitted). Reliability and accuracy in decision-making is actually enhanced by the introduction of evidence that provides a more accurate, fuller picture of the defendant as an individual, whether that picture is positive or negative. *Paxton,* 1993 OK CR 59, ¶ 41, 867 P.2d at 1323. We, in accord with many other courts, continue to hold the use of unadjudicated offenses to prove future dangerousness does not violate due process. *See e.g., United States v. Corley,* 519 F.3d 716, 723–24 (7th Cir.2008); *Brown v. Sirmons,* 515 F.3d 1072, 1091–92 (10th Cir.2008); *Brown v. Dretke,* 419 F.3d 365, 376 (5th Cir.2005); *United States v. Lee,* 274 F.3d 485, 494 (8th Cir. 2001).

■ ¶ 68 Harmon also argues that *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) requires unadjudicated offenses to be proven beyond a reasonable doubt to ensure the principle that guilt is to be established by probative evidence and beyond a reasonable doubt. He asks that we scrutinize our current procedure allowing the use of unadjudicated crimes and hold that such evidence is an untrustworthy foundation for a sentence of death. He asks this Court to create specific guidelines and instructions governing the introduction of unadjudicated offenses in a capital sentencing proceeding.

¶ 69 The *Ring* Court held that aggravating circumstances that make a defendant eligible for the death penalty must be found by a jury beyond a reasonable doubt. *Ring,* 536 U.S. at 609, 122 S.Ct. at 2443. Harmon cites no case holding that *Ring* requires unadjudicated offenses offered to prove future dangerousness be proven beyond a reasonable doubt. Harmon's jury was instructed that it must unanimously find the existence of at least one aggravating circumstance beyond a reasonable doubt before it could impose the death penalty. *Ring* does not require more. The evidence of Harmon's prior robberies and assaults was part of an accumulation of facts that led his jury to conclude beyond a reasonable doubt that Harmon posed a continuing threat to society. We reject Harmon's claim that there is a need under *Ring* to eliminate the use of unadjudicated offenses to prove future dangerousness or to

set forth guidelines and instructions for their use in a capital sentencing proceeding.

■ ¶ 70 Finally, Harmon argues the use of unadjudicated offenses deprived him of an impartial jury. He contends that the same jury that had moments earlier convicted him of felony murder could not impartially judge the evidence in second stage showing he had committed four other robberies and two assaults and fairly decide whether the State had proved the aggravating circumstances. In *Paxton,* we noted the possibility that evidence of unadjudicated bad acts might be prejudicial to the defendant is no reason to exclude it from the jury's consideration in second stage. *Paxton,* 1993 OK CR 59, ¶ 38, 867 P.2d at 1322. "It is the nature of the criminal trial that the State presents evidence prejudicial to the defendant." *Id.* Harmon's case was decided by jurors who were free from outside influence, bias and personal interest. We cannot find that the jurors' impartiality was compromised because of the admission of admissible, relevant evidence. The jury was properly instructed on the law and evidence and we presume the jury followed its instructions. *See Littlejohn v. State,* 2008 OK CR 12, ¶ 15, 181 P.3d 736, 741. This claim is denied.

### 15.

### Use of Unadjudicated Offenses Violates the Eighth Amendment

■ ¶ 71 Harmon argues the use of unadjudicated offenses to prove future dangerousness also violates the Eighth Amendment. We have repeatedly held that the use of unadjudicated acts passes constitutional muster and that use of such evidence is relevant in deciding future dangerousness. *Smith v. State,* 2007 OK CR 16, ¶ 78, 157 P.3d 1155, 1178; *Lambert v. State,* 1999 OK CR 17, ¶ 67, 984 P.2d 221, 239. We find the reasoning in our prior decisions remains sound. We reject this claim accordingly.

### 16.

### The Constitutionality of Applying the "Serving a Term of Imprisonment" Aggravating Circumstance to a Parolee

■ ¶ 72 Oklahoma law makes the fact that the "murder was committed by a per-

son while serving a sentence of imprisonment on conviction of a felony" an aggravating circumstance. 21 O.S.2001, § 701.12(6). Harmon asks us to reconsider our prior cases holding that this aggravator applies to those defendants who commit murder while on parole. He argues this aggravator should apply only to those defendants in physical custody in jail or in prison. Any other application, according to Harmon, would result in an overbroad application of the aggravator that fails to fulfill the narrowing function under the Eighth Amendment.

¶ 73 This same claim was rejected in *Cleary v. State*, 1997 OK CR 35, ¶ 42, 942 P.2d 736, 747. *See also Grant*, 2009 OK CR 11, ¶ 38 n. 24, 205 P.3d at 17 n. 24. The *Cleary* court considered the definition of parole and concluded that a sentence which is unexpired is still being served.[21] Because Harmon, like Cleary, was serving a sentence, albeit on parole, this aggravating circumstance was properly applied to him. We are satisfied this interpretation gives effect to the legislature's intent and note the legislature has not seen fit to change the wording of this statutory aggravating circumstance in light of our holding in *Cleary*.

### 17.

### Juvenile Offenses

¶ 74 Harmon argues the admission of his juvenile offenses to support the aggravating circumstances that the murder was committed while he was serving a term of imprisonment and to show that he posed a continuing threat to society violates the Eighth Amendment under *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005)(holding execution of individuals who were under the age of 18 at the time of their capital crimes violates the Eighth and Fourteenth Amendments). Harmon maintains that the holding and reasoning in *Simmons* should preclude the use of juvenile adjudications to support aggravating circumstances in a capital sentencing pro-

ceeding. We rejected this exact claim last year in *Mitchell v. State*, 2010 OK CR 14, ¶¶ 83–87, 235 P.3d at 659–60. Harmon's analysis and authorities provide no reason to overturn our holding in that case.

### 18.

### The Murder Was Heinous, Atrocious or Cruel: Sufficiency of Evidence

¶ 75 Harmon claims the evidence was insufficient to prove beyond a reasonable doubt that the murder was especially heinous, atrocious or cruel. We review the record to determine whether the evidence, in the light most favorable to the State, was sufficient for a rational trier of fact to find the aggravating circumstance beyond a reasonable doubt. *See Magnan v. State*, 2009 OK CR 16, ¶ 29, 207 P.3d 397, 407, *cert. denied*, —— U.S. ——, 130 S.Ct. 276, 175 L.Ed.2d 185 (2009).

¶ 76 To establish that the murder was heinous, atrocious, or cruel, the State must prove: (1) that the murder was preceded by either torture of the victim or serious physical abuse; and (2) that the facts and circumstances of the case establish that the murder was heinous, atrocious, or cruel. *DeRosa v. State*, 2004 OK CR 19, ¶ 96, 89 P.3d 1124, 1156. The "term 'torture' means the infliction of either great physical anguish or extreme mental cruelty." *Id.* A finding of "serious physical abuse" or "great physical anguish" requires that the victim have experienced conscious physical suffering prior to death. *Id.* "[T]he term 'heinous' means extremely wicked or shockingly evil; the term 'atrocious' means outrageously wicked and vile; and the term 'cruel' means pitiless, designed to inflict a high degree of pain, or utter indifference to or enjoyment of the suffering of others." *Id.*

¶ 77 Harmon shot the store owner three times just before 7:30 p.m.; the victim lived until 4:00 a.m. the next day. A number of witnesses saw the victim bleeding and moan-

---

**21.** The definition of parole is a "significant restraint" on the liberty of the parolee who is subject to control of the parole board "under the cloud of an unexpired sentence." *Cleary v. State*, 1997 OK CR 35, ¶ 42, 942 P.2d 736, 747 *quoting Plotner v. State*, 1986 OK CR 97, ¶ 3, 721 P.2d 810, 811–12.

ing in pain. The victim's suffering can be heard on the 911 audiotape; the victim was conscious and begging for help. There is no dispute that the victim endured conscious physical suffering before death. The evidence also showed that Harmon stood over his victim going through the victim's wallet while the victim was bleeding from his abdominal and leg wounds. The evidence allowed a reasonable inference that Harmon acted with utter indifference to the victim's suffering. There was sufficient evidence for the jury to find the murder was especially heinous, atrocious or cruel beyond a reasonable doubt.

### 19.

### Heinous, Atrocious or Cruel Aggravator Unconstitutional as Overbroad

¶ 78 Harmon claims that the heinous, atrocious, or cruel aggravating circumstance is unconstitutionally vague and overbroad. He maintains that this Court's attempts to limit and narrow this aggravating circumstance to those cases involving serious physical abuse have been unsuccessful. This Court has rejected similar challenges to the constitutionality of this aggravating circumstance. *See Cuesta–Rodriguez v. State,* 2010 OK CR 23, ¶ 80, 241 P.3d 214, 238; *Thacker v. State,* 2004 OK CR 32, ¶ 26, 100 P.3d 1052, 1058 and cases cited therein. The analysis and authorities presented by Harmon raise nothing new. We continue to find the instructions given regarding the heinous, atrocious or cruel aggravating circumstance sufficiently narrow its application to pass constitutional muster. This claim is denied.

### 20.

### Prosecutorial Misconduct

¶ 79 Harmon argues he was denied a fair trial because of prosecutorial misconduct. In sum he says the prosecutor engaged in name calling and argued facts not in evidence in first-stage closing argument; that he misstated the number of Harmon's prior convictions in second-stage opening statement, and, finally, that he made statements during second-stage closing argument designed to di-

minish, denigrate, or completely invalidate the mitigating evidence that was presented. Harmon objected to some of the remarks, but not to others. Those that were not preserved by timely objection will be reviewed for plain error only. *See Goode,* 2010 OK CR 10, ¶ 73, 236 P.3d at 685.

¶ 80 "Relief will be granted on a prosecutorial misconduct claim only where the misconduct effectively deprives the defendant of a fair trial or a fair and reliable sentencing proceeding." *Mitchell v. State,* 2006 OK CR 20, ¶ 95 n. 208, 136 P.3d 671, 708 n. 208. We evaluate alleged prosecutorial misconduct within the context of the entire trial, considering not only the propriety of the prosecutor's actions, but also the strength of the evidence against the defendant and the corresponding arguments of defense counsel. *Hanson v. State,* 2009 OK CR 13, ¶ 18, 206 P.3d 1020, 1028; *see also Paxton,* 1993 OK CR 59, ¶ 69, 867 P.2d at 1329 (holding that alleged errors of prosecutorial misconduct should not, on an individual basis, serve as cause for reversal, but instead require reversal only if cumulative effect was such that they deprived defendant of fair trial).

¶ 81 With two exceptions, we see nothing in any of the comments, individually or cumulatively, that exceeds the wide latitude parties have to discuss the evidence and reasonable inferences from the evidence. *See Hogan,* 2006 OK CR 19, ¶ 91, 139 P.3d at 936. Specifically, we do not find the prosecutor's argument regarding the mitigating evidence comparable to the argument condemned in *Harris v. State,* 2007 OK CR 28, 164 P.3d 1103. In *Harris,* we found that a prosecutor argued improperly that jurors should not consider defendant Harris's evidence as mitigating because it did not extenuate or reduce his guilt or moral culpability. *Harris,* 2007 OK CR 28, ¶ 25, 164 P.3d at 1113. The prosecutor in this case, however, did not urge the jury to categorically disregard the proffered mitigation evidence, but instead argued that the evidence offered in mitigation did not support an inference of reduced culpability. ("You know, you look at the mitigating evidence that they proffer. It's proper. You consider it."). The prose-

cutor went on to say that any mitigating evidence did not outweigh the aggravating circumstances established by the State. In the end, the prosecutor invited jurors to consider all Harmon's mitigating evidence, weigh it against the aggravating circumstances, and find that the death penalty was appropriate. The prosecutor's argument, while often pointed or skeptical, did not preclude the jury from considering all the mitigating evidence. *Warner,* 2006 OK CR 40, ¶ 192, 144 P.3d at 891; *see also Powell v. State,* 2000 OK CR 5, ¶ 139, 995 P.2d 510, 538 (finding no error where prosecutor made legal arguments as to why mitigating circumstances listed in the jury instructions should not be considered as reducing blame because jury was not precluded from considering, as a mitigating factor, any aspect of defendant's character or record or any circumstances of offense that appellant proffered as basis for sentence less than death). Harmon's jury was properly instructed on the definition of mitigating evidence, the evidence Harmon presented, and the duties of a juror. For that reason, we find no error.

■■■ ¶ 82 In two instances, however, the prosecutor's remarks came very close to crossing the line of permissible argument. We are troubled by the prosecutor's argument that Harmon's mitigation witnesses were put on as "human shields" and by his exhortation to the jury not to let anyone give them a "guilt trip" about doing their job.

¶ 83 We addressed similar remarks recently in *Cuesta–Rodriguez* and found such remarks "come very close to crossing" the line

of proper argument. *Cuesta–Rodriguez,* 2010 OK CR 23, ¶ 99, 241 P.3d at 244. We cautioned prosecutors in future cases to keep their argument focused on the evidence and to avoid making comments that serve no purpose but to denigrate the defense. *Id.* We repeat this warning. Nevertheless, we do not find that any of these comments, individually or cumulatively, contributed to Harmon's death sentence.

### 21.

### Reconsideration of Previously Decided Issues

¶ 84 Harmon raises nine claims, challenging various sentencing phase jury instructions, the constitutionality of Oklahoma's death penalty scheme, and the manner in which the death penalty is carried out.[22]

■■■ ¶ 85 Harmon first challenges the sentencing phase jury Instruction No. 9, as taken verbatim from Instruction No. 4–78, OUJI–CR(2d).[23] He argues that instructing the jury in the permissive language that mitigating circumstances are those which may be considered to extenuate a defendant's conduct and reduce the degree of blame allowed the jury to disregard mitigating evidence. Harmon asked the trial court to give a modified version of the instruction insofar as the instruction defined the term "mitigating circumstances" but he did not object to the permissive language and in fact used permissive language in his proposed instruction as well.[24] Harmon's failure to object to the permissive language waives the issue on

---

22. We are aware that raising these issues previously settled by this Court will tend to prevent a finding of waiver in any subsequent state or federal proceedings in this case.

23. OUJI–CR(2d) 4–78 provides:
Mitigating circumstances are 1) circumstances that may extenuate or reduce the degree of moral culpability or blame, or 2) circumstances which in fairness, sympathy or mercy may lead you as jurors individually or collectively to decide against imposing the death penalty. The determination of what circumstances are mitigating is for you to resolve under the facts and circumstances of this case.
While all twelve jurors must unanimously agree that the State has established beyond a reasonable doubt the existence of at least one aggrava-

ting circumstance prior to consideration of the death penalty, unanimous agreement of jurors concerning mitigating circumstances is not required. In addition, mitigating circumstances do not have to be proved beyond a reasonable doubt in order for you to consider them.

24. Harmon's proposed instruction read:
Mitigating circumstances are those which you may consider in fairness, sympathy and mercy. Mitigating circumstances are defined as "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."
The second paragraph of the instruction mirrors OUI–CR(2d) 4–78.

appeal and review is for plain error only. *See Myers,* 2006 OK CR 12, ¶ 27, 133 P.3d at 324 (when a specific objection is made at trial, this Court will not entertain a different objection on appeal.) We have rejected this claim in the past and continue to find that the second stage instructions, when read as a whole, do not allow the jury to disregard the mitigating evidence presented. *Pickens v. State,* 1993 OK CR 15, ¶¶ 43–45, 850 P.2d 328, 339. We find no plain error.

¶ 86 Harmon argues that Instruction No. 7, taken verbatim from Instruction No. 4–76, OUJI–CR(2d), erroneously implies that a life sentence is appropriate only if the jury failed to find the existence of an aggravating circumstance. Harmon did not object to this instruction at trial. This exact claim was rejected in *Mitchell,* 2010 OK CR 14, ¶ 122, 235 P.3d at 664. *See also Bryson v. State,* 1994 OK CR 32, 164, 876 P.2d 240, 262–63. We find no plain error.[25]

■ ¶ 87 Harmon challenges Oklahoma's death penalty scheme in its entirety as unconstitutional for vagueness, overbreadth, abuse of prosecutorial discretion, arbitrariness, and because it constitutes cruel and unusual punishment. Harmon's brief provides neither argument nor authority to support these sweeping allegations. He purports, however, to "incorporate by reference" into his brief the arguments and authorities on these issues as they were raised in pretrial motions in the trial court Rule 3.5(A)(5), *Rules of the Court of Criminal Appeals,* Title 22, Ch. 18, App. (2011), requires that an appellant's brief, among other things, must include:

> An *argument* containing the contentions of the appellant, which sets forth all assignments of error, *supported by citations to the authorities, statutes, and parts of the record.* Each proposition of error shall be set out separately in the brief. Merely mentioning a possible issue in an argument or citation to authority does not constitute the raising of a proposition of error on appeal. *Failure to list an issue pursuant to these requirements constitutes waiver on appeal. See Armstrong v. State,* 1991 OK CR 34, 811 P.2d 593, 599.

(Emphasis added). Rule 3.5(A)(5) is clear. This rule unambiguously directs that an appellant's argument and authority must be contained within the pages of his brief. Harmon's brief does not comply with the rule, and the issue is waived.

■ ¶ 88 Harmon further contends that the trial court erroneously denied his motion to strike Oklahoma's death penalty sentencing procedure as unconstitutional because it requires a jury to make special findings of fact prohibited by Okla. Const. art. VII, § 15.[26] Harmon asks us to reconsider our prior decision on this issue as set out in *Duckett v. State,* 1995 OK CR 61, ¶ 91, 919 P.2d 7, 27, but provides no argument or authority to support his claim. This issue is waived. Rule 3.5(A)(5), *Rules of the Court of Criminal Appeals,* Title 22, Ch. 18, App. (2011); *see also Cuesta–Rodriguez,* 2010 OK CR 23, ¶ 105, 241 P.3d at 245.

[72] ¶ 89 Harmon argues that the trial court erroneously denied his request for a jury instruction on what he terms "the presumption of a life sentence." He cites *Duckett* and asks us to reconsider our decision in *Duckett* that the court should have instructed the jury to return a sentence of life without parole instead of death, unless the prosecution had demonstrated beyond a reasonable doubt that death was the only appropriate penalty. Again, Harmon provides no other argument or authority to support his claim.

---

25. Even when considered on the merits, this claim fails. Instruction No. 12, taken from Instruction No. 4–80, OUJI–CR(2d), explicitly provided that "[e]ven if you find that the aggravating circumstance(s) outweigh(s) the mitigating circumstances, you *may* impose a sentence of Life Imprisonment With the Possibility of Parole OR Life Imprisonment Without the Possibility of Parole" (emphasis added). Based on this language, there is no reasonable possibility jurors could have read Instruction No. 7 as preventing them from considering life or life without parole as sentencing options if they found the existence of an aggravating circumstance.

26. Section 15 provides:

> In all jury trials the jury shall return a general verdict, and no law in force nor any law hereafter enacted, shall require the court to direct the jury to make findings of particular questions of fact, but the court may, in its discretion, direct such special findings.

The issue is waived under Rule 3.5(A)(5), *Rules of the Court of Criminal Appeals,* Title 22, Ch. 18, App. (2011); *see also Mitchell,* 2010 OK CR 14, ¶ 125, 235 P.3d at 665.

¶ 90 Harmon claims that the trial court erroneously denied his motion to allow him the right of allocution and to make the last argument to the jury, but provides no argument or authority to support this claim. The issue is waived under Rule 3.5(A)(5), *Rules of the Court of Criminal Appeals,* Title 22, Ch. 18, App. (2011).

¶ 91 Harmon claims that Oklahoma's use of lethal injection is cruel and unusual punishment in violation of the Federal and Oklahoma Constitutions. *See* U.S. Const. amend. VIII; Okla. Const. art. II, § 9. Harmon contends that one of the drugs used in the death penalty in Oklahoma (pancuronium bromide) may leave an inmate awake as two other unnamed drugs used in the process cause him to suffocate slowly and painfully. He also argues that Oklahoma's death penalty protocol is flawed because: (1) it shields the identities of those administering the drugs; (2) leaves certain decisions surrounding administration of the lethal drugs up to the individuals administering them; and (3) there is no backup plan should a doctor be unavailable to assist in the execution as a result of medical ethics or other circumstances. This claim was recently rejected in *Cuesta–Rodriguez v. State,* 2010 OK CR 23, ¶¶ 108–109, 241 P.3d at 245–46, because Appellant Cuesta–Rodriguez failed to provide a sufficient record to decide the issue. This Court also refused to consider such a claim in *Mitchell,* 2010 OK CR 14, ¶ 126, 235 P.3d at 665, based on this Court's decision in *Malicoat v. State,* 2006 OK CR 25, ¶¶ 2–11, 137 P.3d 1234, 1235–39.

¶ 92 Harmon presents the same claim and references as *Cuesta–Rodriguez.* As in that case, we cannot find a substantial violation of any constitutional right against cruel or unusual punishment based on the record before us. *See Cardenas v. State,* 1985 OK CR 21, ¶ 7, 695 P.2d 876, 878 ("[i]t is the appellant's burden to include enough of the record on appeal to permit the review of alleged error").

¶ 93 Harmon claims that victim impact evidence is not relevant to proving either the aggravating or mitigating factors necessary to perform the narrowing function for application of the death penalty. He argues victim impact evidence acts instead as a superaggravator and skews the sentencing proceeding in violation of the Eighth Amendment. We have repeatedly rejected this argument in the past and the authority relied on by Harmon fails to persuade us to reach a different result here. *See Cuesta–Rodriguez,* 2010 OK CR 23, ¶ 71, 241 P.3d at 236; *Hogan,* 2006 OK CR 19, ¶ 71, 139 P.3d at 932; *Thacker v. State,* 2005 OK CR 18, ¶ 16, 120 P.3d 1193, 1196; *Harris v. State,* 2004 OK CR 1, ¶ 58, 84 P.3d 731, 752; *Murphy v. State,* 2002 OK CR 24, ¶¶ 45–47, 47 P.3d 876, 886.

¶ 94 Harmon claims that the jury was improperly instructed as to the scope of victim impact evidence. Specifically, Harmon argues that Instruction No. 9–45, OUJI–CR(2d), which the trial court gave as Instruction No. 10 of the second stage jury instructions, contained language permitting jurors to consider that the victim was an "individual whose death may represent a unique loss to society and the family." Harmon argues that the phrase "unique loss to society" improperly allowed jurors to consider the impact of the loss of the victim on society at large rather than simply the impact on the immediate family. This identical claim was recently rejected in *Cuesta–Rodriguez,* 2010 OK CR 23, ¶ 74, 241 P.3d at 237. We reject it here for the reasons stated in that case.

## 22.

### Cumulative Error

¶ 95 Harmon claims that even if no error, standing alone, in his case warrants reversal, the accumulation of errors denied him a fair trial and a fair determination of his sentence. This Court has held that when there are "numerous irregularities during the course of [a] trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors was to deny the defendant a fair trial." *DeRosa,* 2004 OK CR 19, ¶ 100, 89

P.3d at 1157 (quoting *Lewis v. State*, 1998 OK CR 24, ¶ 63, 970 P.2d 1158, 1176). While we conclude that Harmon's trial was not error free, those errors, even when considered in the aggregate, do not require relief. They did not render his trial fundamentally unfair, taint the jury's verdict, or render the sentencing unreliable. Any errors were harmless beyond a reasonable doubt, individually and cumulatively.

### 23.

### Mandatory Sentence Review

¶ 96 Title 21 O.S.2001, § 701.13 requires this Court to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor, and whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance." After conducting this review, this Court may order any corrective relief that is warranted or affirm the sentence. 21 O.S.2001, § 701.13(E).

¶ 97 Having reviewed the record in this case, we find that Harmon's death sentence was not the result of trial error, prosecutorial misconduct, or improper evidence or witness testimony and that the death sentence was not imposed under the influence of any arbitrary factor, passion, or prejudice.

¶ 98 The jury's finding that Harmon posed a continuing threat to society, that the murder was especially heinous, atrocious or cruel, and that the murder was committed while Harmon was serving a sentence of imprisonment is amply supported by the evidence. Weighing the valid aggravating circumstances and evidence against the mitigating evidence, we find, as did the jury below, that the aggravating circumstances outweigh the mitigating circumstances.

### DECISION

¶ 99 The Judgment and Sentence of the district court is **AFFIRMED.** Under Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2011), the

**MANDATE** is **ORDERED** issued upon delivery and filing of this decision.

LEWIS, V.P.J., C. JOHNSON, P.J., LUMPKIN and SMITH, JJ.: concur.